### The GLIDDEN COMPANY, Plaintiff,

v.

### Michael J. JANDERNOA, et al., Defendants.

### No. 1:96CV 72.

United States District Court,
W.D. Michigan,
Southern Division.

June 5, 1997.

Robert Charles Timmons, Boyden, Waddell, Timmons & Dilley, Grand Rapids, MI, Herbert I. Deutsch, Deutsch & Frey, New York City, for Grow Group, Inc. and Glidden Co.

Stephen D. Turner, Law, Weathers & Richardson, Grand Rapids, MI, William G. McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Michael J. Jandernoa, William C. Swaney, Ralph E. Klingenmeyer, Richard G. Hansen, Paul E. Nicholson, M. James Gunberg, Thomas M. Taylor, Larry R. Lutjens, Michael B. Shubeck, S & J Acquisition Corp. and Perrigo Co,

Cynthia M. York, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, Geoffrey A. Fields, Dickinson, Wright, Moon, Van Dusen & Freeman, Grand Rapids, MI, Douglas S. Liebhafsky, Wachtell, Lipton, Rosen & Katz, New York City, William G. McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York City, for National Bank of Detroit.

Douglas S. Liebhafsky, Wachtell, Lipton, Rosen & Katz, New York City, William G. McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York City, for NBD BanCorp., Inc.

Peter L. Gustafson, Warner, Norcross & Judd, LLP, Grand Rapids, MI, William G. McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Old Kent Financial Corp.

Peter L. Gustafson, Warner, Norcross & Judd, LLP, Grand Rapids, MI, Norbert F. Kugele, Warner, Norcross & Judd, LLP, Grand Rapids, MI, William G. McGuinness, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Old Kent Bank and Trust Co.

## OPINION

SCOVILLE, United States Magistrate Judge.

This is a diversity case, in which plaintiff asserts that defendants breached fiduciary duties and committed fraud in connection with a leveraged buyout transaction. The case was initiated in the New York state courts, removed to the United States District Court for the Southern District of New York, and then transferred to this court pursuant to 28 U.S.C. § 1404(a). Presently pending before the court are several motions relating to documents withheld by the Perrigo defendants (all defendants except Old Kent Bank and National Bank of Detroit) on a claim of attorney-client privilege. First, the Perrigo defendants have moved for an order requiring return to them of certain allegedly privileged documents mistakenly produced during the course of discovery. (Motion, docket # 180). Second, the law firm of Law, Weathers & Richardson (LWR), which acted as counsel for the Perrigo defendants during the relevant time, has objected to production of certain documents subpoenaed from their files. (Objections, docket # 190). Finally,

plaintiff has moved to strike the claims of attorney-client privilege by the Perrigo defendants and to compel production of withheld documents. (Motion, docket #247).

The court has issued previous orders dealing with the procedures to be followed in resolving the issues involving the attorney-client privilege asserted by the Perrigo defendants. At a hearing on March 25, 1997, the court determined that the motion to compel return of inadvertently produced documents (docket #180) would be held in abeyance pending resolution of the existence of an attorney-client privilege. (Order, docket #204). On April 8, 1997, the court conducted a preliminary hearing on the objections by LWR. The order resulting from that hearing (docket #216) required LWR to produce certain responsive, but nonprivileged documents; to file a privilege log identifying documents being withheld from production, as required by Fed.R.Civ.P. 26(b)(5) and 45; and to provide a designation reflecting the client or clients asserting the privilege as to each document and the LWR client matter to which the document related. The order also set a briefing schedule and a hearing date for resolution of all issues relating to the attorney-client privilege of the Perrigo defendants.

The court conducted an evidentiary hearing on May 23, 1997. The parties were allowed an extensive opportunity for oral argument, and the Perrigo defendants called John R. Nichols, former partner in LWR and now in-house general counsel for Perrigo, who was examined and cross-examined. The record was held open for a limited time to allow the filing of an affidavit by defendant Jandernoa concerning specific factual issues. The court has reviewed the voluminous motions, briefs, affidavits, and exhibits submitted by the parties on this issue and has considered the arguments and testimony presented at the evidentiary hearing. The court makes the following findings of fact and conclusions of law. The issues now before the court regarding this discovery dispute overlap to a certain extent with the ultimate merits of the case. The findings and conclusions contained in this opinion are expressly interlocutory and govern only the discovery of this case. They are not binding on any party for purposes of summary judgment or ultimate trial of the case. *See Fausek v. White*, 965 F.2d 126, 133 (6th Cir.), *cert. denied*, 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992).

### *Findings of Fact*

#### A. Background

This case involves a management buyout (MBO) [1] of the stock of Perrigo Company by a group of officers and/or directors of Perrigo, each of whom has been named as a defendant. These defendants acquired the stock of Perrigo from its former parent corporation, Grow Group, Inc. (now The Glidden Company), in late April of 1988. At the time directly preceding the acquisition, Grow was a New York Stock Exchange corporation and Perrigo Company, a Delaware corporation, was its wholly owned subsidiary. The individual defendants were officers and/or directors of Perrigo. Law, Weathers & Richardson (LWR), a Grand Rapids law firm, was general counsel for Perrigo but also represented Perrigo management in the MBO.

Perrigo Company is a manufacturer of generic and private-label pharmaceuticals, with its principal place of business in Allegan, Michigan. The facts relevant to the dispute now before the court date back to 1986, when 100 percent of the stock of Perrigo (then a privately held Michigan corporation) was acquired by Grow for $45 million. Mr. Nichols and LWR represented Perrigo in this transaction. As a result of the acquisition, Perrigo became a Delaware corporation. LWR and Mr. Nichols continued to act as general counsel for Perrigo after it was acquired by Grow. The relationship between LWR and Perrigo, as a subsidiary of Grow, was governed in part by a policy statement issued by Grow to all counsel representing its subsidiaries. The policy statement (Plf.Ex. 11) [2]

---

1. A leveraged buyout (LBO) involves acquisition of a company using borrowed money which is ultimately secured by the company's own assets. A management buyout (MBO) is merely an LBO in which the managers of the company participate in the acquisition group.

2. References to plaintiff's exhibits (Plf.Ex.) in this opinion are to the set of exhibits (docket #248)

was transmitted to Mr. Nichols by Lloyd Frank, who at all relevant times was general counsel to Grow. Among other things, the policy statement required all bills for legal services rendered to the subsidiary to be transmitted to Grow and paid "from the New York office." All statements for services rendered were required to be submitted directly to the attention of Mr. Frank. Counsel were required to discuss new matters with the Grow attorney in charge and to arrive at an agreed-upon projection of fees and disbursements, and to submit to the Grow attorney advance drafts of all significant documents. Further, the policy statement required outside counsel to advise the Grow attorney in charge "of all material developments as they occur" and to routinely provide the Grow attorney with copies of all documents, "including letters and *internal* legal memoranda" (emphasis in original). The policy required outside counsel to involve the Grow attorney "in all planning and decisions, including even routine adjournments, where possible." Pursuant to this policy, LWR sent to Grow all bills for legal services performed on behalf of its subsidiary Perrigo and cleared changes in the fee structure directly with Mr. Frank. (*See* Plf. Ex. 12).

The stock market crash of October, 1987, caused economic dislocations for Grow as well as other major American companies. As a result, Grow began investigating methods of obtaining immediate cash from its investment in Perrigo. In approximately November of 1987, Grow began working with Paine Webber, Inc. to investigate a possible financial restructuring of Perrigo. Paine Webber formulated a proposed restructuring, pursuant to which Grow would have divested itself of substantial equity in Perrigo. The proposed restructuring contemplated the participation of senior lenders, subordinated lenders, and equity investors. Grow alleges that Old Kent and NBD expressed their willingness to provide "substantially all" of the funds needed to support $62 million in senior debt under the Paine Webber restructuring proposal. This proposal would have also granted Perrigo management fifteen percent

of the shares of the restructured Perrigo Company, referred to as the "management carry." Grow was to retain approximately forty-five percent of the Perrigo shares. Grow directed Perrigo management to cooperate with Paine Webber in effectuating the proposed restructuring, including generation of the necessary financial information and projections.

At about the same time, Grow directed Perrigo to make a substantial bank loan for Grow's use. Mr. Frank directed defendant Jandernoa to secure the loan, which he placed with Old Kent Bank and NBD. All of the legal work in connection with obtaining the loans was performed by LWR, principally Mr. Nichols. As a result of the loans, which closed in late December of 1987, Perrigo borrowed $65 million, $30 million of which was paid to Grow to satisfy an intercompany debt.

### B. Management Buyout

By December of 1987, significant progress on the Paine Webber restructuring had not occurred. A group of Perrigo officers and/or directors began to contemplate their own acquisition of the company in a management buyout (MBO). It is unclear which defendants, other than defendant Jandernoa, were actively engaged in such contemplations as early as December of 1987. Ultimately, the MBO group comprised the following persons: Michael J. Jandernoa (director and president of Perrigo); William C. Swaney (chairman of Perrigo's board of directors); Ralph E. Klingenmeyer (officer); Richard G. Hansen (officer); Paul E. Nicholson (officer); M. James Gunberg (officer); Thomas M. Taylor (officer); Larry R. Lutjens (officer); Michael B. Shubeck (officer).

On December 29, 1987, Jandernoa and Russell Banks, then chief executive officer of Grow, met for several hours in Banks' office in New York. At this time, Mr. Banks was a director of Perrigo, as well as CEO of Grow. Jandernoa has testified that he proposed to Banks that the Perrigo management acquire Perrigo. Mr. Jandernoa has testified that

filed by plaintiff in connection with the pending motions. References to defense exhibits

(Def.Ex.) are to the exhibits attached to the brief of the Perrigo defendants (docket # 235).

Mr. Banks was very interested in the concept and that he suggested that Mr. Nichols (who had done a "great job" in the then-recent bank loan transaction) could provide the "support and assistance that we would need in putting together a Michigan LBO." (Jandernoa Dep. at 156–58, docket # 235). Mr. Banks (Dep. at 229–232, docket # 235) has absolutely no recollection of the discussions of the meeting. It is clear that the meeting did take place and that a "Michigan LBO" was discussed, as Mr. Banks made such a notation on his diary (Def.Ex. 1). Mr. Jandernoa concedes, however, that no express waiver of any potential conflict of interest resulted from that meeting. (Dep. at 156–57). It is further undisputed that Mr. Jandernoa and his group did not then confirm anything in writing with Grow concerning their contemplated plans to purchase the company.

The management group did not make substantial progress towards an MBO during January of 1988. Mr. Nichols did some limited work, preparing a confidentiality agreement for management's use in contacting a potential financier of the MBO. There is no correspondence to Grow during the month of January concerning a possible MBO, nor is there any written evidence that LWR discussed the matter with Grow counsel in accordance with the policy statement (Plf.Ex. 11). According to Mr. Nichols' hearing testimony, LWR did not establish a separate client, or even a separate matter, number in January of 1988 to capture the time spent on the possible MBO. The minutes of the Perrigo Board meeting of January 28, 1988 (attended by both defendants Jandernoa and Swaney) contain discussion of a restructuring under which Grow would retain an equity interest in Perrigo, but do not reflect any discussion of an MBO or a waiver of any conflict of interest potentially created by a management bid for control of Perrigo (Plf.Ex. 39).

On February 9, 1988, Mr. Banks and Mr. Frank traveled to Michigan to meet with Perrigo management. One of the purposes of the meeting was to discuss the pending Paine Webber restructuring. According to a memo later authored by the members of

Perrigo management (Plf.Ex. 40), Mr. Banks expressed concern about the lack of enthusiasm by the Perrigo management for the Paine Webber restructuring. Management, in turn, expressed confusion about the tax consequences of the fifteen percent management carry and expressed dissatisfaction with the conduct of Paine Webber. The possibility of an MBO was raised expressly by Perrigo management, but rejected by them as "not feasible." Mr. Banks expressed surprise that management would propose its own acquisition. In their memo, management expressed "wholehearted" support of the Paine Webber restructuring, as long as it was based on appropriate projections and the fifteen percent management carry was explained in detail. The memo reflects a commitment by Mr. Frank to "write up a complete explanation" of the fifteen percent proposal for management and its "tax-free" consequences.

In early February of 1988, Lloyd Frank spoke to Mr. Nichols and asked him to consult with Perrigo management concerning the tax ramifications of the Paine Webber "management carry," apparently in response to management's request for clarification. Mr. Frank asked Mr. Nichols to research the tax consequences of this provision and to explain them to the management group. After performing limited research, Mr. Nichols informed Mr. Frank that the transaction would result in the realization of taxable compensation to the management group. During the same conversation, Mr. Frank asked Mr. Nichols whether LWR would be willing to perform legal services directly for Grow. Mr. Frank informed him that Grow was moving work out of New York because of high rates, and he offered LWR legal work in the employee benefits area. Mr. Nichols accepted the work on behalf of LWR and established an attorney-client relationship between the firm and Grow, assigning Grow client number 3077. LWR thereafter performed legal services in the employee benefits area directly for Grow and continued an attorney-client relationship with Grow until sometime in 1994.

Although the parties disagree concerning the question whether Grow ever consented to

the MBO effort before March of 1988, it is clear that in early March of 1988, Grow knew about and consented to the MBO effort. (Frank Dep. at 1055, Plf. Ex. 10). Grow contends that it was "coerced" into participating in MBO negotiations, by the announcement of the management group on March 11 that it would resign if any transaction other than the MBO were consummated. The record does not presently bear out Grow's contention that it negotiated with the management group with a gun to its head. In fact, Mr. Frank testified repeatedly that the relationship was not adversarial. (Frank Dep. at 876, 881–82, 883). The Perrigo defendants contend that Mr. Banks and Nick Preda (an NBD loan officer who had responsibility for the Perrigo account) called Mr. Jandernoa on March 7 and invited an MBO, if it could be completed by March 31, the end of Grow's quarter. Defendants further contend that Banks offered to have Grow provide interim financing, if the deal could be completed as requested. I credit defendants' version of the events of early March of 1988, because the record as presently constituted does not bear any indicia of coercion, and Grow's conduct thereafter is not consistent with its present claim of coercion.[3]

In any event, by March 11, 1988, it was clear to all parties that the individual defendants would be formulating an offer to purchase Perrigo Company from Grow. Mr. Jandernoa informed Mr. Nichols that Banks had authorized Jandernoa to put together an MBO. Jandernoa also told Nichols that Banks authorized him to use the services of LWR "on behalf of Perrigo and members of the then current management to represent them in this process." (Nichols Aff., ¶ 23, docket # 235). At that point, both the individual defendants and LWR were burdened with conflicts of interest. As officers and directors of Perrigo, the individual defendants had continuing fiduciary duties to Grow, the sole shareholder. Mr. Nichols' hearing testimony confirmed that the individual defendants owed such duties to Grow as long as they remained officers and/or directors. Likewise, LWR had a direct attorney-client relationship with both Perrigo and Grow by March of 1988.

Nevertheless, neither the individual defendants nor their counsel made any written disclosure to Grow acknowledging the conflicts of interest, nor is there any written evidence of Grow's informed consent to the various conflicts. Specifically, there is no written evidence of a (1) waiver by the Perrigo Board of the conflict of interest created by LWR's representation of its officers and directors individually; (2) waiver by Grow of the conflict created by LWR's representation of the management group in negotiations against Grow, also an LWR client; or (3) consent by Grow that the Perrigo officers and directors, despite their fiduciary duties to Grow, could maintain a *confidential* attorney-client relationship with LWR concerning Perrigo's affairs, to the exclusion of Grow. Although Grow obviously knew by early March that LWR would be giving legal advice to the management group, there is no evidence of an agreement that the advice could be kept from Grow, which otherwise had a right of full disclosure from the Perrigo management concerning all things relating to Perrigo. Mr. Frank has testified that he was unaware that the Perrigo management was receiving confidential advice from LWR that was being withheld from Grow. (Frank Dep., 1058–59, Plf. Ex. 10). Defendants have adduced no contrary evidence.

The situation was compounded by the fashion in which the individual defendants and LWR chose to document the attorney-client relationship arising from the MBO effort. Rather than establishing the management group as the firm's client, LWR merely created a new matter under the billing for Perrigo Company. The new matter was called "Perrigo–Management LBO" and assigned a new billing number, 35–15. Billing number 35 belonged to the Perrigo Company, with general matters assigned to number 35–1. All time spent by the law firm on the MBO project was billed to Perrigo under matter

---

3. Most significantly, Grow agreed in the first stock purchase agreement (Def.Ex. 5) to finance $49 million of the purchase. It is inconceivable to me that a public corporation being coerced by rebellious and insurgent subsidiary managers would agree to be the principal financier of the coup d'etat.

number 35–15. There is no evidence that the books and records of LWR reflect the management group (or any member thereof) as a client of the firm on the MBO transaction. Although LWR generally sent bills for Perrigo work directly to Grow, time spent on matter 35–15 was not. Rather, the time was accumulated and collected from the client after the transaction, so Grow did not bear any of the expense. (See letter dated April 1, 1988 (Def.Ex. 2)).

On the present record, there is insufficient evidence to support a finding that the management group established a separate attorney-client relationship with LWR, apart from the firm's role as Perrigo's general counsel. The evidence, and especially the complete lack of engagement letters or written disclosures and consents in a conflict-laden situation, points strongly to LWR's representation of the management group as officers and directors of Perrigo, with continuing duties of candor and disclosure to Grow, despite management's second role of prospective stock purchasers. If the management group intended to create an arms-length situation, in which it would enjoy a confidential relationship with LWR to the exclusion of Grow, the evidence does not support either the actual creation of such a situation or Grow's informed consent to it.

Grow retained the New York law firm of Lord, Day & Lord to represent it in the MBO transaction. On March 20, 1988, Mr. Jandernoa and Mr. Nichols participated in a twenty-hour-long negotiating session in New York with regard to the MBO. Grow was represented by Mr. Frank and Sam Friedman, a partner of Lord, Day & Lord. Mr. Nichols testified that the negotiations were "fairly tense," but not acrimonious. From his point of view, the negotiations were at "arms length." By contrast, Mr. Frank testified that the parties were proceeding cooperatively and were not adversarial. (Frank Dep. at 880–83, Plf. Ex. 10).

After negotiating several drafts, the parties reached a written agreement dated March 23, 1988 (Def.Ex. 5). The stock purchase agreement was between Grow Group, Inc. as seller and S & J Acquisition Corp., a Michigan corporation owned by the management group and other investors, as purchaser. In the stock purchase agreement, the parties agreed to the sale by Grow Group of all its shares in Perrigo Company for $55,-754,000.00, in addition to S & J's assumption of $45 million in debt. The agreement (¶ 2) called for the payment of $6 million at closing, with the remainder covered in the short term by a promissory note to Grow. The transaction was scheduled to be closed on March 31, 1988, but for reasons still unclear, Grow unilaterally called off the closing.

The parties thereafter resumed negotiations, leading to the execution of a second stock purchase agreement, dated April 15, 1988 (Def.Ex. 4). Under the revised agreement, S & J Acquisition Corporation would buy all of the outstanding shares of Perrigo for $61 million, approximately $5 million more than the originally agreed-upon price. In addition, the new deal was for cash only and no longer involved interim financing by Grow. Instead, defendants Old Kent Bank and NBD provided financing, in addition to debt financing and equity investment by the Hillman Group, which has not been named as a defendant.

On April 29, 1988, the transaction was closed in New York City. As a result of the transaction, S & J Acquisitions, a Michigan corporation owned by the Perrigo management and the Hillman Group, became the sole shareholder of the stock of Perrigo Company. Perrigo Company was thereafter merged into S & J Acquisitions, and the name of the surviving corporation was changed to Perrigo Company. Consequently, the present Perrigo Company (which is named as a defendant in this case) is a Michigan corporation, whereas it had been a Delaware corporation during the time that it was a wholly owned subsidiary of Grow. The parties agree, however, that the present Perrigo Company is successor to the rights and liabilities of the former Delaware corporation.

### C. This Case and the Attorney–Client Privilege Controversy

Grow commenced this action by filing a Summons With Notice in the New York County Supreme Court on April 13, 1994,

and served defendants on July 26, 1994. In accordance with practice allowed in the New York state courts, no formal complaint accompanied the summons. The summons charged defendants with breach of fiduciary duties, usurpation of corporate opportunities, intentional interference with prospective contractual relationships, and conspiracy, seeking damages in excess of $2 billion. The defendants removed the action to the United States District Court for the Southern District of New York on August 4, 1994, on the basis of complete diversity of citizenship. Thereafter ensued protracted procedural wrangling in the Southern District of New York. Plaintiff did not file a complaint until March 1, 1995, some eight months after removal. The complaint, spanning forty-seven pages, contains four counts. Count 1 charges members of the management group with breach of their fiduciary duties as officers and directors of Perrigo arising from alleged concealment of material information from Grow, failure to cooperate in the Paine Webber restructuring, and usurpation of corporate opportunity. Count 2 charges the bank defendants with breach of duty, conspiracy and aiding and abetting the other defendants in their fraudulent and illegal conduct. Count 3 charges members of the management group with breach of a joint venture agreement, referring to the abortive restructuring under the Paine Webber plan. Count 4 charges all defendants with fraud in the inducement leading up to the April 29, 1988 stock purchase agreement.

By opinion and order entered January 31, 1996, the federal court in New York transferred the action to this court pursuant to 28 U.S.C. § 1404(a), finding that the balance of conveniences weighed in favor of litigation and trial in the Western District of Michigan. In the same opinion, the court denied motions to dismiss by certain defendants. The case's history in this court has been similarly marked by procedural, tactical, and strategic maneuvering by the parties.

Relevant to the presently pending motions, the Perrigo defendants have filed three lists of documents withheld from discovery upon a claim of attorney-client privilege (Plf.Exs.2, 3, 4). In addition, the Perrigo defendants

have filed an extensive analysis, dated April 22, 1997, pursuant to the court's direction to do so. The analysis (Plf.Ex. 5) lists and describes 116 documents withheld on a claim of privilege, and further identifies the client matter to which each privileged document relates. Likewise, LWR, again acting pursuant to the court's direction, filed a list of privileged documents contained in its file, including an identification of the client or clients on whose behalf the privilege is being asserted (Plf.Ex. 6). Shortly before the evidentiary hearing, LWR filed a supplemental list of privileged documents (Plf.Ex. 7).

With regard to the time of their creation, the withheld documents fall into three categories. The first category (category A documents) comprises documents generated before December 29, 1987, the first possible date upon which Grow is alleged by defendants to have acquiesced to consideration of an MBO, taking all facts and inferences completely in defendants' favor. The second category (category B documents) comprises documents generated after December 29, 1987, until April 29, 1988, the date that the stock purchase transaction was closed. At all times relevant to categories A and B documents, Perrigo Company was a Delaware corporation, wholly owned by Grow. The third category (category C documents) comprises documents generated after April 29, 1988, the date of closing.

In its presentation of arguments and evidence at the hearing, Grow asserted two essential reasons supporting its request for production of documents withheld on attorney-client privilege. First, Grow argues that communications involving or disclosed to Perrigo Company prior to April 29, 1988, are not privileged as against Grow, then sole shareholder. Second, Grow invokes the crime/fraud exception to the attorney-client privilege. With regard to the crime/fraud exception, Grow argues that it has presented evidence establishing probable cause to believe that defendants committed fraud and breaches of fiduciary duty in connection with the stock purchase transaction. Although Grow has presented voluminous documentation in support of this assertion, its factual contentions are essentially threefold. First,

Grow asserts that the management group maintained two sets of projections. The first, more pessimistic projections, were disclosed to Grow in an effort to suppress the purchase price. The second, more optimistic (and allegedly more accurate) projections were allegedly shared with potential lenders. Grow contends that the alleged concealment was material and induced it to enter into a disadvantageous contract. Second, Grow argues that the Perrigo managers breached their fiduciary duties to Grow as corporate parent by concealing the more accurate projections, surreptitiously pursuing the MBO without permission or full disclosure, and sabotaging the Paine Webber restructuring by failing to cooperate or to provide necessary information, especially to Desai, the putative subordinated debt lender under the Paine Webber restructuring plan. Finally, Grow accuses Perrigo management of concealing the realistic prospect that Perrigo's sales to Wal–Mart would increase materially in the future.

In response, the Perrigo defendants assert that the attorney-client privilege belonging to Perrigo (a Delaware corporation) passed to the present Perrigo (a Michigan corporation) by operation of merger, and that the attorney-client privilege now belongs to the Perrigo defendants. In addition, they strenuously challenge both the factual basis, and the characterizations to be drawn therefrom, for the assertion of a crime/fraud exception to attorney-client privilege.

### Discussion

#### I. Choice of Law

■ A federal district court sitting in diversity generally applies the law of the state in which it sits, including that state's conflicts-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 230 n. 3 (6th Cir.1997). An exception to this general rule applies when a case is transferred from one district to another pursuant to 28 U.S.C. § 1404(a). In that circumstance, the transferee court is to apply the conflicts-of-laws rules of the state in which the transferor court sits. *See Van-Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct.

805, 820–21, 11 L.Ed.2d 945 (1964); *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir.1994). Because the present case was transferred to this court from the United States District Court for the Southern District of New York, this court must apply New York conflicts-of-laws rules.

■ New York courts apply a "substantial interest" test to govern choice of law in tort cases. Under that test, "controlling effect" is given to "the law of the jurisdiction in which, because of its relationship or contract with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963); *see Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609, 613, 642 N.E.2d 1065, 1069 (1994); *Tartaglia v. Paul Revere Life Ins. Co.*, 948 F.Supp. 325, 326 (S.D.N.Y.1996). A unique feature of New York conflicts-of-laws rules is the concept of depecage, under which the rules of one legal system may be applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues. *See Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir.1984); *see also, Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir.1997). Under the concept of depecage, the law of one state may govern substantive claims, while the laws of other states govern issues such as attorney-client privilege. In the recent *Tartaglia* decision, for example, the Southern District of New York applied New York interest analysis to conclude that the law of New York should govern a question of privilege, although Ohio law applied to the underlying contract claim. 948 F.Supp. at 326–27. Similarly, in *Hutner*, the Second Circuit applied New York law to the plaintiff's express contract claim, but turned to the law of California, which had a greater interest in the issue, to determine whether the plaintiff should have held a certain license. 734 F.2d at 901; *see also Damin Aviation Corp. v. Sikorsky Aircraft*, 705 F.Supp. 170, 174 (S.D.N.Y.1989) ("New York follows the doctrine of depecage and applies the law of different states to different issues in the same case.").

■ The conflicts-of-laws questions in this case promise to be vexing and hotly contested. For purposes of the present motion, however, it is not necessary to identify the state or states whose law will govern the ultimate issues in the case.[4] For present purposes, it is sufficient to identify, applying New York conflicts-of-laws rules, those states whose law will govern the issues presently before the court. First, and most important, is the issue of the fiduciary duties of the officers and directors of Perrigo Company to the company itself and to its sole shareholder, Grow Group. Closely related are the questions of Grow's rights as sole shareholder, and the rights of Mr. Banks and Frank as Grow's director designees on the Perrigo Board. The New York courts apply the law of the state of incorporation to govern allegations of breach of fiduciary duty owed to a corporation and to determine other issues involving a corporation's internal affairs. *See Walton v. Morgan Stanley & Co., Inc.,* 623 F.2d 796, 797 n. 3 (2d Cir.1980); *Caruso v. Metex Corp.,* No. CV 89–0571, 1992 WL 237299, at * 15 (E.D.N.Y. July 30, 1992); *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969); *Kikis v. McRoberts Corp.,* 225 A.D.2d 455, 639 N.Y.S.2d 346 (1996); *Hart v. General Motors Corp.,* 129 A.D.2d 179, 517 N.Y.S.2d 490, 494 ("Delaware is obviously a state in which, for various reasons, many businesses chose to incorporate. The corporation and its shareholders rightfully expect that the laws under which they had chosen to do business will be applied. For choice of law purposes, the decision by shareholders to incorporate under the law of one jurisdiction is no different from designating the law governing a business trust, which, prima facie determines the applicable law.") (citations omitted), *appeal denied,* 70 N.Y.2d 608, 521 N.Y.S.2d 225, 515 N.E.2d 910 (1987). This is in accordance with nearly universal conflicts-of-laws rules. I therefore conclude that the law of the State of Delaware governs the rights and responsibilities of the officers, directors, and shareholders of Perrigo Compa-

ny, a Delaware corporation at all relevant times up to and including April 29, 1988.

■ There is limited New York authority analyzing the law to be applied in resolving assertions of attorney-client privilege. *See Sackman v. The Liggett Group, Inc.,* 920 F.Supp. 357, 362 (E.D.N.Y.1996). In general, the New York courts follow a "grouping of contacts" approach in determining what law applies to assertion of attorney-client privilege. *Id.* In the context of the present case, it is inevitable that Delaware law must also govern the issues involving attorney-client privilege. No one disputes the general proposition that communications between LWR and its client Perrigo or LWR and the Perrigo management are generally subject to attorney-client privilege, as against the outside world. The important question is whether that privilege can be asserted against Grow in the present case. That issue is governed by the rights and responsibilities of the parties *inter sese.* I believe that the New York courts would determine that this is a matter of internal corporate governance, and therefore subject to the laws of the state of incorporation, Delaware. Michigan, the state in which both Perrigo management and counsel were headquartered, would also have a strong interest. I conclude that that interest is outweighed, however, by the interests of the state of incorporation, which governs the client's substantive fiduciary duties. Furthermore, I do not believe that application of Michigan law would lead to a different result.

■ Finally, and decidedly least important in the context of the present motions, are the ethical duties of counsel for Perrigo. Under New York conflicts rules, the state in which a law firm is licensed to practice is deemed to have the strongest interest in regulating attorney conduct. *See LNC Invest., Inc. v. First Fidelity Bank, N.A.,* 935 F.Supp. 1333, 1350–51 (S.D.N.Y.1996). Consequently, to the extent that the issue may be relevant to the present dispute, I conclude that the ethical duties of LWR are governed by the laws of the State of Michigan. *See also, In re Rospatch Securities Lit.,* No.

---

**4.** In a previous memorandum opinion, I assumed without analysis that New York substantive law governed the claims in this case. Several parties rightly objected. I freely confess error and withdraw the challenged statement, leaving the question open for another day.

1:90cv 805, 1992 WL 226912, at * 13–14 (W.D.Mich. July 8, 1992) (professional duties of Michigan law firm performing services in Michigan governed by Michigan law).

 The Perrigo defendants argue, on the basis of Michigan conflicts-of-laws rules, that Michigan law should control all issues relevant to this motion, because the stock purchase agreement is governed by Michigan law. This argument suffers from two fundamental flaws. First, it ignores the rule of *Van Dusen v. Barrack,* which requires this court to apply New York conflicts rules because of the section 1404(a) transfer from a New York federal court. Second, it assumes that the law governing the parties' contract will govern all issues. The stock purchase agreement does expressly provide that it will be governed by the laws of the State of Michigan (Def.Ex. 4, ¶ 19). The New York courts will generally honor such a choice of law provision in a contract. *See Damin,* 705 F.Supp. at 173. The issues presently before the court, however, are not governed by the contract. As discussed above, under the analytical technique of depecage, the law of different states may apply to different issues in the same case. The New York courts often determine that state law other than that governing a contract claim will control other issues in the case. *See, e.g., U.S. Metalsource Corp. v. W & B Associates, Inc.,* No. 90 CIV 5983(SWK), 1997 WL 159595, at * 22 (S.D.N.Y. April 3, 1997) ("Under New York law, a choice of law provision indicating that a contract will be governed by a certain body of law does not dictate the law that will govern noncontract based actions.' "); *Damin,* 705 F.Supp. at 173 (Connecticut law governed contract claims while New Jersey law governed tort claims arising from helicopter crash). Consequently, although the contract is governed by Michigan law, the New York courts would not apply Michigan law to all issues in the case in the circumstances here presented.

## II. Privilege Issues

### A. *Privilege of Perrigo Company*

 Delaware law recognizes a broad attorney-client privilege. Under Delaware law, a client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. DEL. U.R. EVID. 502(b). Delaware follows the general rule that places upon the party asserting the privilege the burden of establishing that the privileged communication was made in the confidence of the attorney-client relationship and remained in that confidence. *Moyer v. Moyer,* 602 A.2d 68, 72 (Del.1992). With regard to communications between LWR and its client Perrigo Company, the parties do agree upon certain fundamental propositions. First, they agree that such communications are generally privileged from disclosure to outsiders. Furthermore, both parties recognize that the privilege now belongs to Perrigo Company (Michigan). *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). Under *Weintraub* and its progeny, invoking or waiving the corporation's privilege is an incident of control of the corporation. *Yosemite Inv., Inc. v. Floyd Bell, Inc.,* 943 F.Supp. 882, 883 (S.D.Ohio 1996); *In re Grand Jury,* 734 F.Supp. 1207, 1211 (E.D.Va.1990). The Perrigo defendants rely heavily upon this concept in arguing their position. This concept, although unobjectionable, is only the first step of the analysis. As the surviving entity after a merger with Perrigo (Delaware), Perrigo (Michigan) indeed does have the authority to assert or waive the attorney-client privilege. The critical issue is whether Perrigo can assert the privilege against Grow with regard to communications antedating April 29, 1988, during which time Perrigo (Delaware) was a wholly owned subsidiary of the Grow Group.

 Grow's position on this issue is unassailable, while the contentions of the Perrigo defendants are unsupported in law. At all relevant times antedating April 29, 1988, Perrigo (Delaware) was a wholly owned subsidiary of Grow. The universal rule of law, expressed in a variety of contexts, is that the parent and subsidiary share a community of interest, such that the parent (as well as the subsidiary) is the "client" for purposes of the attorney-client privilege. *See Crabb v. KFC Nat'l Management Co.,*

No. 91–5474, 1992 WL 1321 (6th Cir. Jan.6, 1992) ("The cases clearly hold that a corporate 'client' includes not only the corporation by whom the attorney is employed or retained, but also parent, subsidiary and affiliate corporations.") (quoting *United States v. AT & T*, 86 F.R.D. 603, 616 (D.D.C.1979)). Consequently, disclosure of legal advice to a parent or affiliated corporation does not work a waiver of the confidentiality of the document, because of the complete community of interest between parent and subsidiary. *Id.* at * 2. Numerous courts have recognized that, for purposes of the attorney-client privilege, the subsidiary and the parent are joint clients, each of whom has an interest in the privileged communications. *See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y.1989); *Medcom Holding Co. v. Baxter Travenol Lab.*, 689 F.Supp. 841, 842 (N.D.Ill.1988). Simply put, a sole shareholder has a right to complete disclosure about the legal affairs of its wholly owned subsidiary. Mr. Jandernoa acknowledged as much in his deposition (Dep. at 720) (the files of Perrigo "were available to the owner [Grow] anytime the owner wanted.").

■ Closely related is the shareholder-fiduciary exception to the attorney-client privilege. This exception, which was most extensively formulated by the Fifth Circuit in *Garner v. Wolfinbarger*, 430 F.2d 1093, 1101 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), has been expressly recognized by the Sixth Circuit Court of Appeals. *Fausek v. White*, 965 F.2d 126 (6th Cir.), *cert. denied*, 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992). The exception is most often invoked by minority shareholders seeking access to corporate attorney-client communications in a suit seeking vindication of shareholder interests. *Fausek*, 965 F.2d at 130. The doctrine is founded on a recognition that there is often a mutuality of interest between a corporation's management and the shareholders (who are the beneficiaries of their efforts) in legal advice rendered to the corporation. The ownership interest of shareholders in a corporation may preclude assertion of the attorney-client privilege against them with regard to the affairs of a corporation which they own. *Garner*, 430 F.2d at 1101. The courts

have prescribed a series of factors, by which the existence of good cause for defeat of the privilege should be judged. These include the percentage of stock held by the inquiring shareholder; the bona fides of the shareholder; the nature and merit of the claim; the need for production of the information; and other relevant inquiries. *Fausek*, 965 F.2d at 130. In *Fausek*, the Sixth Circuit determined that a corporation could not assert attorney-client privilege against a former forty percent shareholder alleging fraud and breach of trust by an officer and director. 965 F.2d at 133. *A fortiori*, when the inquiring corporation is a former 100 percent shareholder seeking an accounting of the affairs of the corporation during a time when it was a wholly owned subsidiary, good cause exists to require disclosure.

■ It is clear from these general authorities that Perrigo Company had no reasonable expectation that it could keep anything secret from its parent corporation. As long as Perrigo was a wholly owned subsidiary of Grow, Perrigo's officers had no legal ability to resist disclosure to Grow of any of Perrigo's records, including its attorney-client communications.

■ The Delaware courts apply these general principles even more stringently where, as here, the parent corporation has placed directors on the subsidiary board. Delaware law recognizes a broad right in corporate directors to access corporate records and documents, both by statute, 8 DEL. CODE 220(d), and common law. *See Henshaw v. American Cement Corp.*, 252 A.2d 125, 128 (Del.Ch.1969); *Holdgreiwe v. Nostalgia Network, Inc.*, No. 12914, 1993 WL 144604 (Del.Ch. April 29, 1993). This right extends to documents otherwise protected by the corporation's attorney-client privilege. *Estate of Polin v. Diamond State Poultry Co.*, No. 6374, 1981 WL 7612, at * 1 (Del. Ch. April 14, 1981). Consequently, directors have a right to access attorney communications of the company relating to the time that they served as directors. *Kirby v. Kirby*, 1987 WL 14862, at * 6 (Del.Ch. July 29, 1987). Where a parent corporation has placed directors upon its subsidiary board,

this principle operates to grant access to the subsidiary's attorney-client materials to both the director and the parent corporation. *See Moore Business Forms, Inc. v. Cordant Holdings Corp.*, Nos. 13911, 14595, 1996 WL 307444 (Del.Ch. June 4, 1996).

The recent Delaware Chancery decision in *Moore Business Forms* is instructive and bears brief discussion. The case involved an MBO, in which the management created a holding company to effectuate the transaction. As part of the MBO, Moore Business Forms received convertible redeemable preferred stock, making it the largest shareholder of the holding company, with roughly thirty-seven percent of the shares. As part of the transaction, Moore received the contractual right to place a director on the board. Thereafter, Moore's preferred stock was redeemed, in a transaction that it challenged as fraudulent. In the ensuing lawsuit, Moore sought discovery of legal advice rendered by counsel concerning the challenged transaction. Relying upon a long line of Delaware authorities, the Chancery Court held that as a general matter, a corporation cannot assert the attorney-client privilege to deny a director access to legal advice rendered during the director's tenure. 1996 WL 307444, at * 3. Invoking the "joint client" doctrine discussed above, the court determined that all directors should be treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors. *Id.* at * 4. The court went on to observe that under Delaware law, the parent corporation placing a director on the subsidiary board "was as much a 'client' for purposes of having access to the attorney's advice as the defendants who were asserting the privilege." *Id.* at * 4 (citing *AOC Ltd., Partnership v. Horsham Corp.*, No. 12480, 1992 WL 97220 (Del.Ch. May 5, 1992)). The Vice–Chancellor summarized his holding as follows:

Because the attorney-client privilege belongs to the client, it would be perverse to allow the privilege to be asserted against the client. To adopt the defendants' position would achieve precisely that result. The client in this case is the Holdings board. Mr. Rogers was a member of that board, having the same status as the other directors. No basis exists to assert the privilege against him or, by extension, against Moore.

*Id.* at * 6.

It is therefore patent, both under general legal principles and under the specific holdings of Delaware law, that Perrigo Company had no legal ability to shield information, including attorney-client communications, from Grow Group or Mr. Banks and Mr. Frank, Grow officers placed on the subsidiary board by the sole corporate shareholder. As long as Perrigo was a wholly owned subsidiary of Grow, its records and legal affairs were an open book.

In urging a contrary result, Perrigo does not raise any substantial argument or authority. It asserts that Perrigo and Grow were at all times separate corporations, with the appropriate corporate formalities observed. On this basis, Perrigo charges Grow with acting inconsistently, by availing itself of the protections of separate incorporation while essentially seeking to ignore the separate corporate identity for purposes of attorney-client communications. The inconsistency, if there is one, is one sanctioned by law. The cases fully support the concept that a sole corporate parent has such a community of interest with its subsidiary that the subsidiary's attorney-client privilege cannot be asserted against the corporate parent. The cases do not require, as an incident of exercise of the parent's right, that the parent forswear the protection of separate corporate existence. The issue concerns the relationship between parent and subsidiary, an internal corporate matter. It has nothing to do with duties to third parties. Significantly, the Perrigo defendants cite nothing in support of their "inconsistency" argument.

■ Perrigo's remaining arguments focus upon the alleged lack of an attorney-client relationship between LWR and Grow.[5] I note

5. The questions of attorney-client privilege now before the court require recognition and discussion of the fiduciary obligations of Perrigo management and the ethical duties of LWR. This opinion contains no finding—or intimation—that

at the outset that the Perrigo defendants, and not Grow, have injected this issue into the case. The Perrigo defendants assert that as a general matter, Michigan law provides that an attorney for a corporation does not automatically have an attorney-client relationship with its shareholders. As an abstract principle, this statement is unobjectionable. *See Adell v. Sommers, Schwartz, Silver & Schwartz, P.C.,* 170 Mich.App. 196, 428 N.W.2d 26, 29 (1988); *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.,* 107 Mich.App. 509, 309 N.W.2d 645, 648 (1981). This concept, while true, does not advance the analysis materially. The attorney-client privilege belongs to the client, Perrigo Company, and not to the lawyer. The issue, then, is whether Perrigo can resist the demands of its former sole shareholder for information relating to the period in which Perrigo was owned by Grow. The existence of an attorney-client relationship *vel non* between LWR and Grow is not dispositive of this question.

Furthermore, the issue is not so neat as Perrigo would suggest. In the principal case upon which Perrigo relies, the Michigan Court of Appeals expressly determined that the absence of an attorney-client relationship between the lawyer and the corporate shareholder "does not necessarily mean that defendant [attorney] had no fiduciary duty to plaintiff [the shareholder]." 309 N.W.2d at 648. The existence of an attorney-client relationship merely establishes a *per se* rule that the lawyer owes fiduciary duties to the client. Even in the absence of a direct attorney-client relationship, however, a duty of disclosure may indeed exist. *Id.* Consequently, it is clear under Michigan law that mere lack of an attorney-client relationship between the lawyer and the corporate parent, standing alone, is not the end of the inquiry.

 In a similar vein, the Perrigo defendants make the bold assertion that LWR

did not owe a fiduciary duty to Grow and that no fiduciary relationship existed between the law firm and the corporate parent. In light of the facts of this case, I find that statement astonishing. The facts disclose a fiduciary relationship between LWR and Grow, arising from two separate relationships. First, LWR accepted an attorney-client relationship with Grow in February of 1988 in order to perform employee benefits work. Although LWR now attempts to denigrate the relationship by characterizing it as "limited," the record does not reflect any limitation on the firm's ethical duties to its client. By accepting a client even for a single matter, an attorney undertakes a duty of loyalty to the client. *Atlanta Int'l Ins. Co. v. Bell,* 438 Mich. 512, 475 N.W.2d 294, 296 (1991). Second and independent were the duties to Grow contractually undertaken by LWR when its client Perrigo was acquired by Grow in 1986. Despite the lack of a formal attorney-client relationship, an attorney may owe fiduciary duties to a party who places faith and confidence in him with his consent. *Fassihi,* 309 N.W.2d at 648. The policy statement issued by Grow to LWR made it clear that Grow was relying on LWR to advise it of all material developments concerning Grow's subsidiary and to disclose to Grow letters and internal legal memoranda. (Plf.Ex. 11). There is no evidence that LWR ever informed Grow that it was unwilling to abide by these undertakings. In light of the direct attorney-client relationship between LWR and Grow and the law firm's contractual undertaking to advise Grow of material information concerning Grow's corporate subsidiary, defendants' denial that a fiduciary relationship existed between LWR and Grow is untenable.[6]

 For the foregoing reasons, I conclude that neither Perrigo Company nor LWR may legally assert an attorney-client privilege on behalf of Perrigo and against Grow for any period during which Grow

---

either the Perrigo defendants or LWR breached any duty to Grow.

**6.** Despite its relationship with Grow, LWR could represent the management group in negotiations against Grow if the requirements of Mich. R. Prof. Resp. DR5–105 (in effect in March and

April, 1988) concerning representation of conflicting interests were met. It is one thing for an attorney to argue that he properly represented conflicting parties after full disclosure and consent. It is another to deny owing any fiduciary duty at all to a party who was clearly a client.

Group was its corporate parent. Consequently, Perrigo's assertion of attorney-client privilege for documents in categories A and B (all requested documents dated on or before April 29, 1988) will be overruled. The same result obtains with regard to "undated" documents listed on the privilege logs. A log must be sufficiently detailed so that the court can judge the propriety of assertion of the privilege. FED.R.CIV.P. 26(b)(5). Consequently, the risk of nonpersuasion arising from an incomplete or inadequate log falls on the party claiming privilege. *United States v. Construction Prod. Research, Inc.*, 73 F.3d 464, 473–74 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996). The logs are insufficient to establish the existence of a privilege log for undated documents. Perrigo thus has not borne its burden of proving privilege in connection with undated documents, and its assertion of a privilege in connection with those documents will be overruled.

### B. *Individual Defendants and S & J Acquisition Corp.*

With regard to many of the documents withheld on a claim of attorney-client privilege, the privilege is asserted on behalf of the individual officers and directors of Perrigo and S & J Acquisition Corp., as well as Perrigo Company itself. For documents dated on or before April 29, 1988, the assertion of a privilege by these defendants suffers from two fundamental flaws. First, all such documents were prepared for Perrigo Company, at a time when Perrigo was a wholly owned subsidiary of Grow. Second, and independent, the assertion of attorney-client privilege is inconsistent with the fiduciary duty owed by these defendants to Grow.

As an initial matter, it is difficult to discern how the officers and directors of Perrigo, or the acquisition corporation they formed to effectuate the MBO, can assert an exclusive attorney-client privilege in files belonging to Perrigo Company. The analysis of the Perrigo defendants' privilege logs (Plf.Ex. 5), submitted by defendants pursuant to this court's direction, contains the crucial revelation that neither the management group nor S & J Acquisition Corp. was ever shown on the books of LWR as a client. Rather, the client was at all times Perrigo Company (client no. 35), with the matter designated as "Perrigo—Management LBO" (matter no. 35–15). The privilege log analysis discloses that most of the attorney-client documents generated in March and April of 1988 relate to Perrigo matter no. 35–15.

The Perrigo defendants attempt to explain away this situation by claiming that it related only to how the bill would be ultimately paid. They contend that Grow had no interest in these particular files of its subsidiary because the bill for matter no. 35–15 was never charged to Grow and was ultimately paid by the surviving Perrigo entity after the merger. This explanation is insufficient. If the intent were truly to establish an attorney-client relationship independent from LWR's role as Perrigo counsel, the firm's records could have shown S & J Acquisitions as the client. If the transaction were consummated, the subsequent merger of S & J with Perrigo would have made the legal bills the obligation of the surviving corporation. This arrangement would have made LWR's bills the obligation of the management group, while leaving both Perrigo (Delaware) and Grow out of the attorney-client relationship in the meantime. Instead, defendants chose to establish Perrigo as the only client. As Perrigo management and their counsel were sophisticated, this court can only conclude that they intended the natural consequences of their decision.

 All of the documents for which the management group and their acquisition corporation now claim an attorney-client privilege were clearly the property of Perrigo, at a time when Grow was its sole shareholder. An officer's claim of attorney-client privilege is presumptively lost if the allegedly privileged documents are in the possession of the corporation. *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986). Absent a substantial factual showing, the presumption is that communications to corporate counsel were in the course of the corporation's business rather than the officer's personal affairs. *Id.* This, standing alone, is sufficient ground to deny the Perrigo management the right to assert a sepa-

rate privilege in documents belonging to the corporation.

■ Mr. Jandernoa's recently filed affidavit avers that he and the other members of his group had the expectation of confidentiality in the communications between them and LWR with regard to the MBO transaction. (Affidavit, docket # 255, ¶ 22). The affidavit does not attempt to explain why, in light of this expectation, the management group nevertheless chose to establish the attorney file as that of Perrigo and not in their own names. Even so, taking the affidavit at face value, the management group has not established grounds for denying Grow access to these files. It is certainly plausible, under the facts, that the Perrigo management considered their personal communications with LWR to be privileged, even though the files belonged to Perrigo. At best, the management group thereby had a joint privilege, shared with Perrigo, the owner of the files and the only client shown on the attorney's records. See Diversified Ind., Inc. v. Meredith, 572 F.2d 596, 611 n. 5 (8th Cir.1977) (en banc) (possible for officers and corporation to have joint privilege in company legal advice). Parties sharing a joint attorney-client privilege may not assert the privilege against each other. See Bass Public Ltd. Co. v. Promus Companies, Inc., 868 F.Supp. 615, 620 (S.D.N.Y.1994); Polycast, 125 F.R.D. at 50–51; Valente v. Pepsico, Inc., 68 F.R.D. 361, 368 (D.Del.1975). As was discussed at length in the previous section, privileged materials belonging to Perrigo while it was a subsidiary of Grow may not be kept from Grow. Consequently, even granting the management group some protectible attorney-client privilege in Perrigo's MBO files does not allow them to assert that privilege against Grow.[7]

■ But a separate and more fundamental principle requires rejection of the management group's position. As officers and directors of Perrigo Company, the management group owed Grow, its sole shareholder, an "uncompromising duty of loyalty." Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983); Guth v. Loft, Inc., 5 A.2d 503, 510 (Del.1939). Michigan law is to the same effect. See Gaff v. Federal Deposit Ins. Corp., 828 F.2d 1145, 1151 (6th Cir.1987) ("Under Michigan law, directors and officers of the corporation owe a fiduciary duty to the corporation's shareholders."); Pittiglio v. Michigan Nat. Corp., 906 F.Supp. 1145, 1154 (E.D.Mich.1995) (applying Michigan law). This duty generally forbids corporate directors and officers from using their position of trust to their own private advantage. See Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1279 (Del.1989). It also imposes upon officers and directors an "unremitting obligation" of candor and disclosure. Id. at 1282. In the context of the sale of a corporation, this fiduciary duty requires directors and corporate management to obtain the highest available value for stockholders. See Edelman v. Fruehauf Corp., 798 F.2d 882, 886 (6th Cir.1986) (applying Michigan law); Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del.1985).

■ It is obvious, therefore, that the Perrigo management was heavily burdened with a conflict of interest once it decided to seek to purchase Perrigo from Grow. This conflict of interest has been noted by the Delaware courts. The Delaware Chancery Court has described the "inherent" conflict of interest faced by management in an MBO as follows: "Management's personal motivation as a potential buyer is to pay as little as possible. Management's duty as a fiduciary is to obtain the highest available value for the stockholders." In re Formica Corp. Shareholders Lit., No. 10598, 1989 WL 25812, at * 9 (Del.Ch. March 22, 1989). This inherent conflict of interest places upon management certain responsibilities, depending on the context of the MBO. Where management seeks to acquire the equity interest owned by public shareholders, the law requires scrupulous adherence to certain procedures designed to ensure fairness. This generally

7. In order to accept defendants' position on this point, the court would be required to find that Perrigo had no interest in the attorney-client files established under its name and billed to its account 35–15 and that the only "clients" on those files were the officers and directors, whose names do not appear on the firm's books. To merely state the proposition is to demonstrate its improbability.

requires the constitution of a committee of independent directors to negotiate with management in an attempt to gain the highest value for the shareholders. *Id.* at * 9–12. Where, as here, the acquisition does not seek the equity interest of the public shareholders, management's fiduciary duties may not require such extensive safeguards. Nevertheless, as corporate fiduciaries, management is prohibited from trading in the stock of their corporation on the basis of inside information or from taking advantage of superior knowledge derived from their insider status. *See Field v. Allyn,* 457 A.2d 1089, 1099 (Del. Ch.1983), *aff'd,* 467 A.2d 1274 (Del.1983); *Lank v. Steiner,* 224 A.2d 242 (Del.1966). Management must not use its fiduciary position to gain a particular advantage over other bidders and is under a duty of full disclosure. *Field,* 457 A.2d at 1099–1100. These conflicts of interest, and the duties they create for corporate managers and counsel, were well recognized by 1988. *See, e.g.,* Symposium, *The Role of Counsel in Corporate Acquisitions and Takeovers: Conflicts and Complications,* 39 HASTINGS L.J. 573 (1988); Scott V. Simpson, *The Emerging Role of the Special · Committee—Ensuring Business Judgment Rule Protection In the context of Management Leveraged Buyouts and Other Corporate Transactions Involving Conflicts of Interest,* 43 BUS. LAW 665 (Feb.1988); Patrick S. Dunleavy, *Leveraged Buyout, Management Buyout, and Going Private Corporate Control Transactions: Insider Trading or Efficient Market Economics,* 14 FORDHAM URB. L.J. 685 (1985/1986).

■ I therefore find puzzling the repeated assertion by Perrigo management that the transaction was "at arms length." Management was decidedly not in the same position as a stranger seeking to purchase the corporation. Rather, their position was a "delicate one." *Field,* 457 A.2d at 1098. Management was, and by law should have been, at a distinct disadvantage when seeking to acquire a corporation at the very same time that they owed duties of full candor to the sole shareholder/prospective seller. Unlike strangers, corporate fiduciaries may not withhold special knowledge of corporate affairs and prospects when negotiating for purchase of a shareholder's stock. *See Lynch v.*

*Vickers Energy Corp.,* 383 A.2d 278, 279 (Del.1977); *Lank v. Steiner,* 224 A.2d at 244.

■ In these circumstances, the assertion of attorney-client privilege by the Perrigo management group is inconsistent with its fiduciary duty of loyalty and disclosure to Grow, as Perrigo's sole shareholder. The courts have repeatedly rejected attempts by members of a subsidiary board of directors from asserting attorney-client privilege against the parent corporation, to which they owed fiduciary duties. *See, e.g., Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 689 F.Supp. 841, 843–44 (N.D.Ill.1988); *In re Diasonics Sec. Lit.,* 110 F.R.D. 570, 574 (D.Colo.1986); *accord, AOC Ltd. Partnership v. Horsham Corp.,* No. 12480, 1992 WL 97220 (Del. Ch. May 5, 1992) (forty percent shareholder allowed to pierce claim of privilege asserted by one owing a fiduciary duty). As one early decision put it:

A fiduciary cannot turn his responsibilities on and off like a faucet.... As long as that duty existed, so did the concomitant interests of the [ ] shareholders in knowing the legal communications concerning the future of their company.

*Bailey v. Meister Brau, Inc.,* 55 F.R.D. 211, 214 (N.D.Ill.1972). This is but one application of the general rule of fiduciary law, which holds that the fiduciary's duties of candor outweigh his interests in attorney-client confidences. Because of the mutuality of interest between the parties, "the faithful fiduciary has nothing to hide from the beneficiary." *Quintel Corp., N.V. v. Citibank, N.A.,* 567 F.Supp. 1357, 1363 (S.D.N.Y.1983); *see Riggs Nat'l Bank v. Zimmer,* 355 A.2d 709, 712–13 (Del.Ch.1976).

■ The management group nevertheless argues that it had a reasonable expectation of confidentiality in its communications with LWR, which was representing the management group in connection with its MBO efforts. It is certainly possible that corporate management in the position of the Perrigo officers and directors could carefully structure a situation to afford themselves some level of attorney-client confidentiality when they sought to acquire the corporation in which they are simultaneously acting as

fiduciaries. After all, one in a fiduciary position to a corporation and its shareholders "is not absolutely prohibited from dealing in all transactions in which his corporation may have an interest." *Field*, 457 A.2d at 1099. Presumably, fiduciaries in this circumstance have a right to hire counsel to facilitate the transaction. The universal rule of law, however, imposes upon fiduciaries the burden of proof when they seek to justify a transaction in which they have a conflict of interest. *See Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255, 264 (2d Cir.1984) (collecting cases); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–110 (Del.1952); *Steiner v. Meyerson*, 1995 WL 441999, at * 2 (Del.Ch. July 19, 1995) (if complaint, accepted as true, alleges serious conflict of interest, the burden shifts to director to show complete fairness). In the context of the present motions, the burden is on the Perrigo management to show full disclosure of their conflicting interests and an agreement by Grow that they could maintain separate attorney-client confidences despite their fiduciary duties to Grow. *See Moore Business Forms, Inc. v. Cordant Holdings Corp.*, No. 13911, 1996 WL 307444 (Del.Ch. June 4, 1996). In *Moore*, the Vice-Chancellor found that a fiduciary could defeat disclosure of attorney-client material only by proving "an × ante agreement among the contracting parties." *Id.* at * 4. The court rejected the defendants' claim that the parties "understood" that there would be no disclosure, because of the absence of any express evidence proving such an agreement. *Id.; accord, Hall v. Search Capital Group, Inc.*, No. 15264, 1996 WL 696921, at * 2 (Del.Ch. Nov.15, 1996) ("Absent a governance agreement to the contrary, each director is entitled to receive the same information furnished to his or her fellow board members.").

▮ The same result must obtain in this case. Although the individual defendants contend that they were given oral permission to explore an MBO as early as December 29, 1988, the fact, scope or extent of the permission was never reflected in writing or made the subject of proceedings before the board of either Perrigo or Grow. Even crediting defendants' assertion that they were proceeding with Grow's consent (or at least that of Mr. Banks), there is no evidence of any "*ex ante* agreement" that the managers would be allowed to maintain attorney-client confidences to the exclusion of Grow, despite their fiduciary duties. The situation was compounded by the decision of the management group to retain LWR, who already represented both Perrigo and Grow, as their counsel in the transaction. Even ignoring LWR's direct attorney-client relationship with Grow itself, the firm's position as general counsel for Perrigo precluded any reasonable expectation in the management group of absolute confidentiality in their dealings with the firm. In certain circumstances, LWR's obligations to Perrigo would require it to bring information to the attention of the corporate board, on which Grow representatives held a seat. A firm representing both an organization and one of its members has a duty to explain this eventuality and to advise that discussion with the employee may not be privileged from disclosure to the entity. *Griva v. Davison*, 637 A.2d 830, 841–42 (D.C.App.1994). This court must assume that LWR complied with this duty, and that the officers and directors of Perrigo were thus on notice that the attorneys' conflicting loyalties might result in loss of an otherwise applicable attorney-client privilege.

Consequently, although careful disclosure and consent procedures by the Perrigo management and their counsel might have created a situation in which they could maintain a separate attorney-client privilege consistent with their fiduciary duty, they have failed at this point to sustain their burden of proving that such procedures were actually followed. The result is, at best, a highly ambiguous situation, in which the Perrigo managers were at the same time negotiating for an advantageous purchase while under a fiduciary duty of disclosure, even of information that worked to their disadvantage as purchasers. In the process, they were represented by a law firm with similarly deep conflicts of interest. There is no written disclosure by the fiduciaries, nor written waiver of conflict of interest by Grow, that might lead a court to conclude that the cor-

porate parent had agreed to something less than full disclosure in the circumstances. As fiduciaries with the uncompromising duty of loyalty, the Perrigo management must bear responsibility for this ambiguous situation.

Rather than proving scrupulous disclosure of the conflict of interest and the procuring of express consent to attorney-client confidence between the management group and LWR, the Perrigo defendants argue for consent on the basis of circumstance, inference, and atmospherics. They point, for example, to Mr. Jandernoa's testimony that Banks twice authorized him to use the legal services of LWR to represent the Perrigo management in the MBO. (Jandernoa Aff., ¶ 21). The lack of any written confirmation of the fact or scope of this consent leaves the situation vague, even taking Mr. Jandernoa's assertions at face value. The suggestions of Mr. Banks concerning counsel, even if made, are insufficient to satisfy defendants' burden. LWR, after all, was general counsel for Grow's subsidiary and had a direct, although limited, attorney-client relationship with Grow itself. The firm had just recently performed legal work for Perrigo, at Grow's direction, in connection with a $65 million bank loan. It is more than barely possible that Mr. Banks believed that LWR would be working cooperatively, with the interests of all parties in mind. Mr. Frank testified that this was indeed his understanding of LWR's role in the transaction. (Frank Dep., 882). Although defendants ridicule Mr. Frank's testimony, it is reasonable, given the duties of the Perrigo management, the role of LWR, and the lack of any documentation to the contrary.

■ Perrigo management also points to Grow's retention of its own law firm, Lord, Day & Lord, to represent it in the transaction. Apparently, the court is to infer from this fact an implicit waiver of the conflict of interest and a consent by Grow to confidentiality between the Perrigo management and LWR. Such inferences are an inadequate substitute for proof. Where dual representation creates a conflict of interest, the burden is on the attorney involved to approach both clients with an affirmative disclosure and a request for express consent. Independent consultation with another lawyer by the opposing party is insufficient to satisfy the obligation of full disclosure. *Griva*, 637 A.2d at 845. Finally, the fact that the stock purchase agreement provided that S & J Acquisitions would pay the legal bill of LWR does not remotely approach proof of an agreement that the Perrigo management could maintain a confidential attorney-client relationship on Perrigo matters despite its duty of full candor to Grow.

■ The law imposes certain obligations upon both corporate fiduciaries and attorneys who seek to advance conflicting interests. They have the duty to make full disclosure and obtain clear and informed consent. If the transaction thereafter goes sour, theirs is the burden of proving full disclosure and the fact and scope of consent. This burden is not met by arguing that the party to whom the duty was owed had constructive knowledge of the conflict. *See IBM Corp. v. Levin*, 579 F.2d 271, 281 (3d Cir.1978). Such a position would shift the burden from the fiduciary to the party to whom the duty is owed. *Id.* at 282. To satisfy the burden of full disclosure, it is not sufficient that both parties be informed of the fact that a lawyer is undertaking to represent both of them. Rather, there must be a disclosure of risks in such detail that the person can understand the reasons why it may be desirable to withhold consent. *Unified Sewerage Agency v. Jelco Inc.*, 646 F.2d 1339, 1345 (9th Cir.1981); *Florida Ins. Guaranty Assoc., Inc. v. Carey Canada, Inc.*, 749 F.Supp. 255, 258 (S.D.Fla. 1990); *Ransburg Corp. v. Champion Spark Plug Co.*, 648 F.Supp. 1040, 1046 (N.D.Ill. 1986).

■ On the present record, I cannot find that the Perrigo management or S & J Acquisitions, the company they established for purposes of the transaction, have met their burden of showing that Grow agreed that they could exercise a confidential attorney-client relationship with LWR, despite their fiduciary duties to Grow. Applying this finding to the three categories of withheld documents, I determine that the Perrigo management has no conceivable right to assert attorney-client privilege with regard to documents antedating December 29, 1988,

the first date upon which they contend they disclosed the possibility of an MBO to Grow. Before that date, there is no possible argument that Grow consented to a limitation of management's fiduciary duties to it. Their assertion of attorney-client privilege with regard to category A documents must therefore be overruled. With regard to category B documents (generated from December 29, 1987 through April 29, 1988), Perrigo management might have been entitled to assert a privilege upon meeting their burden of proving that Grow consented to a limitation of their fiduciary duty of candor after appropriate disclosure. As the Perrigo management has failed to sustain this burden, their objection to production of attorney-client privileged documents in category B must likewise be overruled. After the closing of the stock purchase transaction on April 29, 1988, the Perrigo management ceased to have a fiduciary duty to Grow and all attorney-client communications related to Perrigo (Michigan), in which Grow had no interest. Their assertion of an attorney-client privilege with regard to documents generated thereafter will therefore be sustained.

## C. *Crime/Fraud Exception*

Grow asserts an alternative theory to defeat the attorney-client privilege claimed by the Perrigo defendants. Grow has invoked the so-called crime/fraud exception to the attorney-client privilege. The crime/fraud doctrine has been adopted by the federal courts, as well as the courts of Delaware and Michigan. *See United States v. Zolin,* 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989); *Matter of Sutton,* No. 96M–08–024, 1996 WL 659002 (Del.Super.Ct. Aug.30, 1996); *People v. Paasche,* 207 Mich. App. 698, 525 N.W.2d 914 (1994). This court's ruling concerning the category A and category B documents makes it unnecessary to address the crime/fraud exception with regard to those documents, as Grow has already received complete relief. It is necessary, however, to address the crime/fraud exception to determine whether it may defeat defendants' assertion of attorney/client privilege as to category C documents, which were created after the stock purchase agreement was consummated.

The crime/fraud exception to the attorney-client privilege is predicated on the recognition that attorney advice facilitating the commission of future wrongdoing should not be shielded from disclosure. *Zolin,* 491 U.S. at 561, 109 S.Ct. at 2625. In order to invoke the crime/fraud exception, Grow bears the burden of establishing two propositions: (1) that there is probable cause to believe that defendant committed a crime, fraud, or breach of duty, and (2) that the attorney's assistance or advice was obtained in furtherance of the criminal or fraudulent activity. *See Zolin,* 491 U.S. at 564, 109 S.Ct. at 2627; *In re Grand Jury Investigation (Schroeder),* 842 F.2d 1223, 1226 (11th Cir.1987); *In re Antitrust Grand Jury (Advance Publications, Inc.),* 805 F.2d 155, 163 (6th Cir.1986).

In its presentation before and at the hearing, plaintiff focused virtually exclusively upon the first prong of the test. Plaintiff principally points to evidence garnered in discovery which, in plaintiff's estimation, establishes reasonable grounds to believe that the Perrigo management showed Grow one set of projections while showing more optimistic (and ultimately more accurate) projections to prospective lenders. Plaintiff has also argued that the evidence establishes probable cause to believe that the Perrigo defendants underplayed the prospect that Wal–Mart would become a major customer after the acquisition. The Perrigo defendants have contested both the facts asserted by plaintiff and plaintiff's characterization of those facts.

It is not necessary to determine whether Grow has established probable cause on the merits of its fraud or breach of duty case, sufficient to invoke the crime/fraud exception, because Grow has essentially ignored the second essential element. Grow apparently assumes that a plaintiff may have full discovery of all attorney-client communications between defendants and counsel in any case where a plaintiff's fraud allegations are colorable. This is not the law. The attorney-client privilege is not vitiated merely because a client is alleged to have committed an unlawful or fraudulent act; there also must be a *prima facie* showing

that the confidential communication was involved in the preparation or furtherance of the specific unlawful conduct. *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 40 (D.Md.1974); *see Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 155 (D.Del.1977). "[M]erely because some communications may be related to a crime is not enough to subject that communication to disclosure; the communication must have been made with an intent to further the crime." *In re Antitrust Grand Jury*, 805 F.2d at 167. Although plaintiff need not show that the lawyer knew of or was complicit in the client's unlawful purpose, *see Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469–70, 77 L.Ed. 993 (1933); *United States v. Soudan*, 812 F.2d 920, 927 (5th Cir.1986), plaintiff must establish that the communications with counsel were intended in some way to facilitate criminal or fraudulent activity. Where there is no satisfactory showing that the communications were made in furtherance of the fraud, it is unnecessary to decide whether a *prima facie* case of fraud has been shown. *Hercules*, 434 F.Supp. at 155; *Matter of Sutton*, 1996 WL 659002, at * 9–10; *accord, Johnson Electric North America, Inc. v, Mabuchi North America Corp.*, No. 88 CIV 7377(JES), 1996 WL 191590 (S.D.N.Y. April 19, 1996).

■■■ Grow devotes but a single sentence to this issue: "The use of LWR's services to negotiate, draft and participate in closing of the transaction by which the O & D Group acquired Perrigo from Grow amply fulfills any requirement that the consultation be 'in furtherance of' the crime or fraud alleged." (Brief in Support of Plf's Motion, docket # 247, at 24). Grow is thereby treating the entire stock purchase transaction as if it were one massive fraud or breach of duty. The law does not sanction so sweeping an application of the crime/fraud exception. *See Ward v. Succession of Freeman*, 854 F.2d 780, 790 (5th Cir.1988). A management buyout is not a fraud or crime. Rather, the wrongdoing (if any there was) would consist in the alleged nondisclosures and misstatements upon which Grow claims to have relied. Grow has made no *prima facie* showing that any of the attorney-client materials furthered the alleged wrongful conduct. In fact, the only evidence before the court is to the contrary. (*See* Plf. Supplemental Ex. 2, April 12, 1988 memorandum from LWR counseling full disclosure of projections to Grow, docket # 249).

This conclusion is even more strongly compelled with regard to documents post-dating April 29, 1988. The principal thrust of the crime/fraud exception is to uncover attorney advice facilitating present or future wrongdoing. *See Zolin*, 491 U.S. at 561, 109 S.Ct. at 2625, 8, J. WIGMORE, EVIDENCE, § 2298 at 573 (McNaughton Rev. Ed.1961 & supp.1997). Grow has made no *prima facie* showing that the requested attorney-client documents predating April 29, 1988, were in furtherance of fraud, let alone those documents generated after the transaction was complete. Although it is at least theoretically possible that documents produced after a transaction could fall into the crime/fraud exception, *see, e.g., In re John Doe Corp.*, 675 F.2d 482, 491 (2d Cir.1982) (documents reflecting cover-up after transaction completed), this must be viewed as the unusual situation. In the absence of a showing not made here, documents created after completion of a transaction are generally deemed privileged, despite the allegation of crime or fraud. *See In re Grand Jury Subpoena Duces Tecum (Rich)*, 731 F.2d 1032, 1041 (2d Cir.1984).

Plaintiff has failed to satisfy the second prong of the crime/fraud exception. Consequently, document category C (those documents generated after April 29, 1988) remains privileged, and defendants' objections to production will be sustained.

### III. Motion to Return Inadvertently Produced Documents

In February of this year, the Perrigo defendants moved to compel return of twenty-three documents on the ground that they were inadvertently produced during discovery, despite the fact that they were protected by the attorney-client privilege (docket # 180). The court has held that motion in abeyance, pending determination of the underlying privilege issue. The court has now determined that the Perrigo defendants may not assert the attorney-client privilege against Grow with regard to any documents dated on or before April 29, 1988.

The log of inadvertently produced privileged documents (Supplemental Aff. of Ellen Carmody, docket #203, Ex. A) does not disclose the date of many of the allegedly inadvertently produced documents. It was therefore necessary to make cross-references to the three privilege logs and the analysis thereof (Plf. Exs. 2, 3, 4, 5, docket #248) in an effort to divine the dates of the twenty-three documents that are the subject of Perrigo's motion. Reference to the original log shows that the dates for most of the documents are not disclosed. Rather, the date column merely indicates "various" or "undated." This is insufficient. The court has cautioned the parties on more than one occasion that their privilege logs must be complete, such that the court can judge the propriety of the assertion of privilege by reference to the privilege log. *See* FED. R.CIV.P. 26(b)(5). It should be obvious that the date of a document is often crucial in determining the existence of privilege. Where, as here, a privilege log does not provide enough information to support the privilege claim, the assertion of privilege may be rejected on that basis. *See United States v. Construction Prod. Research, Inc.*, 73 F.3d 464, 473–74 (2d Cir.), *cert. denied*, — U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996). For this reason, the assertion of privilege with regard to the following documents listed on Exhibit A to docket #203 is rejected: 2, 3, 4, 5, 8, 9, 12, 16, 17, 18, 19, 20, 21, 22 and 23.

The remaining documents do have discernable dates. Of those documents, all but two are dated on or before April 29, 1988: document nos. 1, 6, 7, 10, 11, 14. The motion for return of those documents will therefore be denied, because these category A and category B documents are not privileged as to Grow.

Finally, two documents (nos. 13 and 15) are dated after April 29, 1988. With regard to these documents, the court finds that the Perrigo defendants have not borne their burden of showing inadvertence under the standards set forth in the court's oral opinion issued January 28, 1997, denying a similar motion by plaintiff. (*See* Transcript, docket #163).

*Conclusion*

For the foregoing reasons, plaintiff's motion to compel production of all documents withheld by the Perrigo defendants on a claim of attorney-client privilege (docket #247) will be granted as to (1) all documents dated on or before April 29, 1988; (2) all documents listed in the privilege logs of the Perrigo defendants or LWR as "undated"; and (3) all requested LWR time records for Perrigo Company, in unredacted form, for services rendered on or before April 29, 1988. The motion is denied for all documents dated thereafter. The objections of the Perrigo defendants and LWR will be disposed of on the same basis. The motion of the Perrigo defendants for return of inadvertently produced documents (docket #180) will be denied.