Kevin P. FITZPATRICK et al., Plaintiffs,

v.

AMERICAN INTERNATIONAL GROUP, INC. et al., Defendants.

No. 10 Civ. 142 (RMB) (MHD).

United States District Court, S.D. New York.

Nov. 24, 2010.

---

Sean O'Shea, O'Shea Partners, LLP, New York City, for Plaintiffs.

Keara M. Gordon, New York City, Stephanie Kara Vogel, New York City, Michael J. Sheehan, Chicago, IL, Charles P. Scheeler, Baltimore, MD, for Defendants.

102

*MEMORANDUM & ORDER*

MICHAEL H. DOLINGER, United States Magistrate Judge.

Plaintiff Kevin P. Fitzpatrick is a former President and former member of the Board of Directors of AIG Global Real Estate Investment Corporation ("AIGGRE"), an entity that is a wholly-owned subsidiary of defendant American International Group, Inc. ("AIG"). He has sued those entities on his own behalf and on behalf of both his two management companies and dozens of limited-liability companies and limited partnerships—referred to as the carried-interest entities—in which he is a member or limited partner. According to Mr. Fitzpatrick, while employed at AIGGRE, he was general partner or managing member of these entities.

The trigger for this lawsuit was Mr. Fitzpatrick's departure from AIGGRE, effective May 12, 2009. Plaintiff attributes this event to the refusal of AIG to continue to share with him and his many carried-interest entities the profits interest engendered from a variety of real-estate investment partnerships in which they shared ownership interests. In opposition, AIG and AIGGRE contend that Mr. Fitzpatrick was terminated for cause based on serious misconduct and performance failings, including the purported pilfering of vast quantities of sensitive corporate documents.

This set of disputes led to the filing by Mr. Fitzpatrick of a complaint that, in its amended form, embodies thirteen claims, the first twelve of which arise under state or Cayman Island law. The first three are claims for breach of contract, one on behalf of Mr. Fitzpatrick alone and two on behalf of him and his management companies. (Am. Compl.¶¶ 263–89). He then asserts two claims for a declaratory judgment; one, asserted by him and his management companies, seeks a determination of entitlement to future profits interest payments, and the other, on his own behalf, seeks a declaration of entitlement to employee benefits. (Am. Compl.¶¶ 290–302). Plaintiffs next assert a derivative declaratory-judgment claim on behalf of the carried-interest entities, seeking a determination of entitlement to future profits interest payments. (Am.Compl.¶¶ 303–10).

The balance of the state-law claims are for fiduciary breach (asserted by Mr. Fitzpatrick and his management companies), a derivative fiduciary-breach claim for the carried-interest entities, a derivative contract-breach claim for the same entities, a claim by all plaintiffs for injunctive relief and specific performance, a claim by all plaintiffs for declaration of a constructive trust, and a claim by all plaintiffs for an accounting. (Am. Compl.¶¶ 311–55). The remaining claim, by Mr. Fitzpatrick, is asserted under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1024, seeking an award of various employee benefits premised on the contention that his termination was not genuinely for cause. (Am.Compl.¶¶ 356–65).

In the course of extended and contentious discovery proceedings, Mr. Fitzpatrick has challenged defendants' invocation of the attorney-client privilege for an apparently large quantity of corporate documents, although the precise universe of documents at issue has not been clarified by the plaintiffs. (*See* Letter to the Court from Michael E. Petrella, Esq., Aug. 24, 2010; Letter to the Court from Petrella, Sept. 30, 2010; Conference Tr., 2–3, Oct. 5, 2010). In substance, Fitzpatrick presses two theories to invade what he assumes—at least for purposes of his argument—would be an otherwise valid claim of privilege by AIG and AIGGRE. He first asserts that by reason of his status as the President and Board member of AIGGRE until May 2009, he was entitled to see all privileged documents reflecting communications between AIGGRE (and possibly AIG) and their counsel, and that as a result he is now entitled, as a litigant asserting claims in his personal capacity against these corporate entities, to see any documents that are covered by the privilege and that date from the period when he served as AIGGRE President and member of the Board. (Letter from Petrella, 4–5, Aug. 24, 2010; Letter from Petrella, 2–8, Sept. 30, 2010). Second, he argues that, based on his financial arrangements with AIG, that company undertook fiduciary obligations to him and the entities that he controlled with respect to payments from the many real-estate partner-

ships in which he and those entities had ownership interests, and that as a consequence he is entitled to invade the attorney-client privilege of AIG and AIGGRE for some unspecified universe of documents under the so-called fiduciary exception to the privilege. (Letter from Petrella, 3–4, Aug. 24, 2010; Letter from Petrella, 8–16, Sept. 30, 2010).

Defendants have opposed this application, contending that Fitzpatrick, who is suing in his individual capacity, is not entitled—by virtue of his former role at AIGGRE—to share in the attorney-client relationship of the corporations, and that he has not satisfied the requirements for invoking the fiduciary exception to the privilege. (Letter to the Court from Keara M. Gordon, Esq., Sept. 23 2010). Having waited in vain for the plaintiffs to identify the specific documents at issue [1], we view the dispute as nonetheless ripe for adjudication, and accordingly address the parties' arguments below.

## I. *The So–Called Kirby Issue*

Fitzpatrick first asserts that he is entitled to access any privileged communications between AIGGRE (and possibly AIG) and corporate counsel dating from when he was President and a Board member of AIGGRE. In support of this argument, he asserts (1) that Delaware law controls because the issue of his entitlement to now see the documents is a matter of corporate governance, (2) that Delaware's Chancery Court has held that former Board members or senior officers are either *ex officio* clients for purposes of viewing privileged corporate communication made during their tenure or are deemed joint clients of the corporations' attorneys for that purpose, (3) that even if Delaware law is inapplicable, the same result follows under New York law, and (4) that even if federal law controls, it should be viewed as consistent with the cited Delaware caselaw.

We disagree. Instead, we conclude that the choice-of-law question is governed by Fed. R. Civ. 501, which dictates that federal common law applies, and that the better reasoned view of the privilege question does not treat Mr. Fitzpatrick as a client for purposes of now demanding access to privileged communications between either corporation on the one hand and their attorneys.

### A. *A Point of Clarification*

At the outset, we note that plaintiffs' initial papers appear to target documents reflecting corporate communications with the firm of Alston & Bird ("A & B"), and focus on the factual issue of whether A & B was representing Mr. Fitzpatrick in his personal capacity as a client during the pertinent period. (Letter from Petrella, 1–3, Aug. 24, 2010). From prior proceedings, we have learned that an A & B attorney, Sean Reynolds, Esq., did in fact represent him for certain limited purposes, particularly in the period from 2003 to 2004. (Letter from Petrella, 2–3, 5, Aug. 24, 2010 (stating that Mr. Reynolds, currently at A & B, began representing Mr. Fitzpatrick in connection with the creation of the carried-interest entities in 2003 and explaining that A & B has identified two "buckets" of records; for the 2003–2004 bucket, the parties agree that Mr. Fitzpatrick was the sole client); Letter from Humphreys, 1–2, Sept. 2, 2010 (confirming that Mr. Reynolds represented Mr. Fitzpatrick beginning in 2003 and noting that Mr. Reynolds joined A & B in 2008)). It equally appears from the record that A & B provided substantial legal services for AIGGRE and AIG during the same period and later on. Complicating the matter somewhat, it appears that the same A & B attorney was the lawyer principally involved in dealing with legal issues for Mr. Fitzpatrick in his personal capacity and in handling legal questions for the corporate clients. (Letter from Humphreys, 2–3, Sept. 2, 2010 (describing the difficulty in sorting out whether Mr. Fitz-

---

**1.** Many, although apparently not all, of these documents apparently repose with the law firm Alston & Bird, which we understand performed personal legal services for Fitzpatrick and corporate legal services for AIGGRE and AIG. The parties and the firm have undertaken a process to identify any documents that plaintiffs and de-

fendants both claim as covered by their own attorney-client relationship with the firm. (*See* Letter to the Court from James F. Moyle, Esq. & William C. Humphreys, Jr., Esq., Sept. 2, 2010; Tr., 6–8, 19–23, 25–26, Oct. 5, 2010). We have not been favored as of yet with a specification of such documents.

patrick alone, Mr. Fitzpatrick and AIG/ AIGGRE, or AIG/AIGGRE alone was the client for the documents in the second "bucket")).

As a result of the firm's dual role, we directed A & B to provide a list of its document categories to both sides in order to confirm which sets of documents reflect services purely for Mr. Fitzpatrick, which involve services purely for the corporate clients and which, if any, reflect services performed for both as joint clients. (Tr., 21–22, Oct. 5, 2010). Based on that categorization, we further directed that Mr. Fitzpatrick be given exclusive access to the first category, and that the defendants be shown the second category and (if applicable) the third category for the purpose of compiling privilege logs. (Tr., 7–8, 21–22, Oct. 5, 2010). Representations from A & B indicate that it separately provided services to Fitzpatrick and the corporations, but may not have represented them as joint clients. (Tr., 20–21, Oct. 5, 2010; *but see* Letter from Moyle & Humphreys, 2, Sept. 2, 2010).

Whether this process generates further issues between the parties remains to be seen. Nonetheless, we view the issues posed by plaintiffs' current application—that is, his assertion of entitlement to see documents that involve communications between A & B or other attorneys and the corporations as clients—as ripe for at least categorical adjudication at this stage.

### B. *The Choice–of–Law Question*

█ As noted, plaintiffs premise their initial argument on the assumption that Delaware law applies. The difficulty with that assumption is found in the terms of Fed. R.Evid. 501, which governs the choice of law pertinent to privilege claims. It specifies that:

> [e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court of the United States pursuant to statutory authority, the privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or subdivision thereof shall be determined in accordance with State law.

As worded, the Rule does not address the question of which set of laws applies when the case encompasses both federal and state-law claims, but the Second Circuit has held that in such circumstances federal law controls, at least if the evidence in question is relevant to the federal claim, even if it is also pertinent to the state claim. *See, e.g., von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir.1987). *Accord, e.g., Fuller v. Interview, Inc.*, 2009 WL 3241542, *3, fn. 3 (S.D.N.Y. Sept. 30, 2009); *Boss Mfg. Co. v. Hugo Boss AG*, 1999 WL 47324, *1 (S.D.N.Y. Feb. 1, 1999).

In seeking to avoid this result, plaintiffs invoke the notion that Mr. Fitzpatrick's claim of a right of access to privileged corporate communications does not involve a privilege issue *per se*, but rather a question of corporate governance, which is controlled by the law of the state of incorporation, and they say that we accordingly must ignore the directives of the Federal Rules of Evidence. (*See, e.g.*, Tr., 12–16, Oct. 5, 2010). Although a few courts have so held in comparable circumstances, *Kirby v. Kirby*, 1987 WL 14862 (Del.Ch. July 29, 1987); *Gottlieb v. Wiles*, 143 F.R.D. 241 (D.Colo.1992); *Glidden Co. v. Jandernoa*, 173 F.R.D. 459 (W.D.Mich.1997), we respectfully disagree.

As plaintiffs' counsel explains his client's position, plaintiffs do not contest the existence of a privilege between the AIG entities and their attorneys, and are arguing only that Mr. Fitzpatrick should be deemed a party to that privileged relationship. Plaintiffs thus imply that Rule 501 covers only the question of whether a privilege exists, and not the related question of who holds the privilege. (Tr., 14–15, Oct. 5, 2010).

We believe that this distinction is untenable. The text of Rule 501 contains no indication that it is to be read in this narrow

fashion. It states a rule for determining which body of law governs "the privilege of a witness," wording that was evidently intended to address not merely the potential existence of a privilege but the related questions of who holds the privilege, the factual premises for invoking the privilege, whether the privilege may be waived, and, if so, by whom and under what circumstances. Indeed, the Advisory Committee Notes refer to the Rule as addressing, quite broadly, "the law of privileges," Fed.R.Evid. 501, 1974 Advisory Committee Notes at 442 (West 2010 Rev. Ed. Fed. Civil Jud. Proc. & Rules), a formulation that plainly references all issues pertaining to the applicability of a privilege in a given set of circumstances.

■ Not surprisingly, then, the federal courts have, with some consistency, invoked or implicitly relied on this rule when addressing all of the issues pertinent to the enforceability of a privilege claim—that is, the right to exclude a litigant or other person from access to an assertedly privileged communication—including the asserted entitlement of a litigant to be deemed a party to a privileged relationship. *See, e.g., Swidler & Berlin v. United States,* 524 U.S. 399, 405–06, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998); *United States v. Int'l Bhd. Of Teamsters,* 119 F.3d 210, 214–15 (2d Cir.1997) (applying federal common law to determine whether corporate officer may invoke corporate privilege despite waiver by corporation); *American S.S. Owners Mut. Prot. & Indemn. Ass'n v. Alcoa S.S. Co.,* 232 F.R.D. 191, 195 (S.D.N.Y. 2005) (explicitly applying Rule 501); *Montgomery v. eTreppid Tech., LLC,* 548 F.Supp.2d 1175, 1178–79 (D.Nev.2008) (invoking Rule 501 to assess former LLC member's asserted right to access LLC's privileged documents). *See also In re Grand Jury Proceedings,* 219 F.3d 175, 185 (2d Cir. 2000) (applying federal common law to determine whether CEO testifying in individual capacity before grand jury waived corpora-

tion's privilege); *Newmarkets Partners v. Sal. Oppenheim Jr. & Cie.,* 258 F.R.D. 95, 99–100 n. 2 (S.D.N.Y.2009) (citing Rule 501 but using both state and federal law since parties did not address choice of law and cited both bodies of law interchangeably). In this case the controlling issue is whether, as a legal matter, Fitzpatrick should be deemed, in his individual capacity, to have been a party to the attorney-client relationship of the company for which he worked in the past, and that is an issue properly addressed under the body of law dictated by Rule 501, since the issue is governed by the law of privilege.[2]

Under Rule 501, there can be no serious dispute that the privilege question is governed here by federal common law. As noted, plaintiff Fitzpatrick asserts a federal claim under ERISA as well as numerous state-law claims. Moreover, the documents in question—insofar as they are assertedly pertinent to his state-law claims—are also of necessity relevant to the federal claim. Fitzpatrick asserts claims against AIG and AIGGRE for wrongful termination and non-payment of profits owed to him and the plaintiff entities, and he presses the view that AIG was anxious to fire him pretextually "for cause" because of its financial straits. The ERISA claim on its face turns in principal part on whether the termination was for cause, and hence it implicates most of the same issues as the state-law claims. It follows—and plaintiffs do not actively dispute this point—that the communications that Fitzpatrick seeks on this application are relevant to the federal claim. Necessarily, then, federal law governs.

### C. Assessing Plaintiffs' Kirby Theory

■ In defining federal common law, we may look to state-law doctrine, but that data serves only as a guide. Ultimately, we consider the pertinent animating principles that govern the scope and rationale for the feder-

---

**2.** It bears mention that plaintiffs' corporate-governance theory of choice of law was actually presented to the Delaware Chancery Court in the very case principally relied upon by plaintiffs, and that court rejected the argument that the privilege issue there (as here)—whether the corporation could block a former director's access

to corporate communications with its attorney from a time when the discovering party was a director—was governed by Delaware corporate law. Instead, the Chancery Court held that it was privilege law that governed the issue. *See Kirby,* 1987 WL 14862, *7 (rejecting plaintiffs' reliance on 8 Del.Code Ann. 8 § 220).

al common law of privilege. *See, e.g., Swidler & Berlin,* 524 U.S. 399 at 403, 118 S.Ct. 2081; *Montgomery,* 548 F.Supp.2d 1175 at 1179.

Plaintiffs would have us rely on the Delaware Chancery decision in *Kirby,* 1987 WL 14862, even if we are applying federal common law. Although a few federal cases appear to have done so, *e.g., Gottlieb,* 143 F.R.D. 241; *Glidden,* 173 F.R.D. 459, we decline to follow their path, which we view as fundamentally at odds with basic principles of attorney-attorney privilege in the corporate context, as recognized by the federal courts and many state courts.

First, a few words about *Kirby,* which involved an intra-family fight over control of a non-profit corporate foundation. The two dueling factions had each separately purported to pass bylaws and undertake votes that were intended to remove each other from the Board of Directors of the corporation. After denying a motion to dismiss, the Chancery Court addressed whether the defendants, including the corporation and its then-current directors, could withhold from production to plaintiffs—who were former Board members—fifteen attorney-client privileged documents from a period when the plaintiffs had been members of the Board. In requiring production to the plaintiffs, the court stated that members of the Board were—by virtue of their position—all "joint clients" of the corporation's attorney, and based on that notion it held that the dissident—and by then former—Board members were entitled to see the privileged corporate communications dating from when they were Board members, even though those former Board members were apparently suing in their individual rather than corporate capacities. The entirety of the court's reasoning, unsupported by any cited legal authority, was the following:

> As to the documents prepared prior to August 13, 1986, I am not persuaded that the attorney-client privilege may be invoked against plaintiffs. The issue is not whether the documents are privileged or whether the plaintiffs have shown sufficient cause to override the privilege.

Rather the issue is whether the directors, collectively, were the client at the time the legal advice was given. Defendants offer no basis on which to find otherwise, and I am aware of none. The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the "joint client" when legal advice is rendered to the corporation though one of its officers or directors.

*Kirby,* 1987 WL 14862 at *7. In contrast, when addressing privileged documents dating from after plaintiffs' removal as directors, the court held that once the plaintiffs were removed from the Board, "it would indeed be a 'fiction' to say that plaintiffs were the clients to whom the legal advice was rendered." *Id.* at *7. Hence the court declined to order production of those later documents on the "joint client" theory.[3]

Since *Kirby,* the Delaware Chancery Court has generally followed its reasoning, although it subsequently modified the analytical ground slightly by re-characterizing the Board members as a "single client" rather than viewing all the members as joint clients, *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.,* 1996 WL 307444, *4 n. 4 (Del.Ch. June 4, 1996), and has since limited that line of cases and declined to apply its reasoning to general partnerships; *SBC Interactive, Inc. v. Corporate Media Partners,* 1997 WL 770715, *5 (Del.Ch. Dec. 9, 1997). As noted, a few federal courts have followed *Kirby,* again without much explanation or analysis. *See Gottlieb,* 143 F.R.D. 241, 247 (concluding that when parties with a common interest have a single attorney to represent them, neither can assert the attorney-client privilege against one another for communications occurring during the period of common interest); *Glidden,* 173 F.R.D. 459, 474 (holding that both "general legal principles," drawn from federal common law, and Delaware law require that a corporate parent must allow the subsidiary and members of the subsidiary board access to information including attorney-client communications).

---

**3.** The court then proceeded to consider whether the plaintiffs, as shareholders, should see these later documents based on the fiduciary exception to the privilege. *Id.* at *7–8.

In assessing this issue, we start with a few well-recognized principles of corporate privilege. First, the attorney-client privilege belongs to the corporation. *See, e.g., CFTC v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (citing *Upjohn Co. v. United States,* 449 U.S. 383, 389–90, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). Second, because the corporation is inanimate, its decisions and communications as a client, as well as for other purposes, must be made by its chosen representatives, typically its Board acting collectively or, in appropriate circumstances, its senior officers. *See, e.g., Weintraub* at 348, 105 S.Ct. 1986; *In re OPM Leasing Servs., Inc.,* 670 F.2d 383, 386 (2d Cir.1982). Third, although Board members may make decisions that are binding on the corporation, in doing so they act in their corporate capacities rather than as non-corporate individuals, and indeed, when so acting, they do so in their fiduciary capacities and are therefore bound to pursue the best interests of the corporation rather than their own possibly conflicting personal interests. *E.g., Weintraub,* 471 U.S. at 348–49, 105 S.Ct. 1986 (citing *Dodge v. Ford Motor Co.,* 204 Mich. 459, 507, 170 N.W. 668, 684 (1919)). *Cf. In re Grand Jury Proceedings,* 219 F.3d at 184–85 (CEO's testimony in individual capacity does not necessarily waive corporation's privilege).

The deficiency that we see in the *Kirby* analysis begins with its conflating the role and authority of the directors when acting in their corporate and in their individual capacities. Federal cases recognize that the privilege of the corporation belongs to the corporation, not to corporate employees or directors. *See, e.g., id.* at 185; *Teamsters,* 119 F.3d at 215. Although privileged corporate communications with counsel, as well as the assertion or waiver of the privilege, must

of course take place through the participation of an individual speaking for the client—be it an officer or a director or the entire Board of Directors or (in the case of a communication) even a low-level employee, *e.g., Weintraub,* 471 U.S. at 348, 105 S.Ct. 1986; *Upjohn,* 449 U.S. at 391, 101 S.Ct. 677; *In re Grand Jury Proceedings,* 219 F.3d at 183–84—that corporate representative is properly viewed as acting in his corporate fiduciary capacity in undertaking that communication or deciding whether to assert or waive the privilege. The mere fact that he is doing so does not create an attorney-client relationship between that person in his individual capacity and the attorney. *E.g., Teamsters,* 119 F.3d at 215. *See also In re Grand Jury Proceedings,* 219 F.3d at 183–85. The privileged relationship in that setting is between the attorney and the corporation. *E.g., Weintraub,* 471 U.S. at 348–49 & n. 5, 105 S.Ct. 1986.[4]

In recognizing a corporate privilege extending to former directors, *Kirby* adverts to the obligation of the directors to see to the affairs of the company, thus purportedly making the directors joint clients (or as *Moore* later put it, making the Board itself the corporate client). *Kirby,* 1987 WL 14862 at *7. In distinguishing the Board or its individual members from the corporation and in identifying the collective (or individual) Board members as the client—rather than treating them as the representatives of the client, though empowered to speak for the client—the Chancery Court's analysis is contrary to settled federal law, which insists that the corporation is the client and the directors and officers are only its representatives. *E.g., In re Grand Jury Proceedings,* 219 F.3d at 185; *Teamsters,* 119 F.3d at 215. In any event, however, even if this characterization by *Kirby* and *Moore* were conceptually

---

4. There may of course be circumstances in which an attorney who is representing the corporation may also undertake legal services for a corporate employee or director, either on a separate project (as was apparently the case here when A & B provided services for Mr. Fitzpatrick with regard to some personal matters) or as part of a joint representation of the company and the employee. In the latter case the two would, as a factual matter, be deemed joint clients, but we understand plaintiffs on the current application not to

be arguing that Mr. Fitzpatrick and AIGGRE (or AIG) were in fact joint clients, but rather that, as *Kirby* holds, by virtue of Mr. Fitzpatrick's position as director or President, he was automatically cloaked in the vestments of a joint client with the company. In any event the question of whether A & B or other attorneys acted for Fitzpatrick and one of the two defendant the corporations as *de facto* joint clients has not been presented to us for adjudication on the current motion.

justified, it would not lead to the result that these courts reached.

■ The obligations of any director to see to the affairs of the corporation and to speak for it last only so long as the director remains in that official position. This distinction is crucial. We understand the Chancery Court's point to be that while charged with these responsibilities and in order to carry them out, the director must be able to see pertinent communications, including those between other corporate representatives and the company's attorneys.[5] Once a director leaves his corporate position, however, his obligations in this respect cease, and hence there is no logical reason why at that point he would need, and should be expected, to be able to access or have any control over corporate communications, including documents embodying privileged communications made in the past while he served the corporation. *E.g., Weintraub,* 471 U.S. at 349 & n. 5, 105 S.Ct. 1986.

Not surprisingly, then, the federal courts have rejected the notion that a former director or officer, even if previously vested with the power to exercise the privilege while a corporate official (presumably only for corporate purposes), may subsequently claim any authority to exercise or waive the privilege at all. As the Supreme Court stated in *Weintraub,* "[d]isplaced managers may not assert privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties." *Id.* at 349, 105 S.Ct. 1986 (citing cases). Thus, the Court observed. "[i]t follows that [a former officer and director] retains no control over the corporation's privilege." *Id.* at 349 n. 5, 105 S.Ct. 1986.

■ This conclusion is well-grounded in the policy underlying recognition of the privilege. To require, as plaintiffs demand, that such access to privileged corporate documents be given to a former director as a matter of course would have seemingly perverse implications, particularly where, as here, the former director assumes an adver-sarial relationship with the corporation. The privileged communications are protected in order to encourage frank discussions between the client and its counsel, *e.g., Swidler & Berlin,* 524 U.S. at 403, 118 S.Ct. 2081; *Weintraub,* 471 U.S. at 348, 105 S.Ct. 1986, and it is to be assumed that the client relies on that assurance of confidentiality in its discussions with its attorney. *E.g., Swidler & Berlin,* 524 U.S. at 407–08 & n. 4, 118 S.Ct. 2081; *Upjohn,* 449 U.S. at 393, 101 S.Ct. 677; *see also Jaffee v. Redmond,* 518 U.S. 1, 17–18, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). To thereafter strip the corporate client of that reasonably assumed protection merely because a director has left his fiduciary position and sued the corporation not only poses the danger of unfair injury to the client—the extent of which is likely to be in direct proportion to the frankness of the communication—but also works to undercut the very goal of the privilege, which is to encourage candor and a clear understanding by the client of his legal rights and responsibilities.

Still more troubling, this sabotaging of the policy underlying the privilege would be a product of the former director's earlier assumption of his own set of obligations to the corporation and would be in the service of that former director's personal interests even though his interests would now, by definition, be adverse to those of the corporation. Under the *Kirby* line of cases, it is only by virtue of the fact that the discovering party previously had fiduciary obligations to the corporation that he would be given the opportunity—after departing from the corporation—to invade the company's privilege, to the detriment of the very entity to which he once bore significant obligations, with the net result that his having had such fiduciary responsibilities would now trigger his ability to cause injury to that same entity.

■ In short, the *Kirby* analysis (1) is fundamentally inconsistent with the rationale for the privilege, (2) ignores the unique and limited role of corporate representatives in communicating with counsel on behalf of the corporation, and (3) allows the fiduciary's termination of his responsibilities to trigger his ability to use the access previously grant-

---

5. Indeed, this authority is typically embodied in statute. *E.g.,* Del.Code Ann. 8 § 220(d); Kan. Stat. Ann. § 17–6510(d).

ed to him for fiduciary purposes as a weapon to advance his own interests at the expense of the corporation. For these reasons we reject this mode of analysis.[6] *Accord, e.g., Gilday v. Kenra, Ltd.,* 2010 WL 3928593, \*3–4 (S.D.Ind. Oct. 4, 2010); *Montgomery,* 548 F.Supp.2d at 1183–87; *American S.S. Owners Mut. Prot. & Indemn. Ass'n,* 232 F.R.D. at 196–98; *In re Braniff, Inc.,* 153 B.R. 941, 943–44 (Bkrty.M.D.Fla.1993); *Nunan v. Midwest, Inc.,* 2006 WL 344550, \*7 (N.Y.Sup. Ct. Jan. 10, 2006) (New York law); *Genova v. Longs Peak Emergency Physicians, P.C.,* 72 P.3d 454, 461–63 (Colo.Ct.App.2003) (Colo. law); *Lane v. Sharp Pkg. Systems, Inc.,* 251 Wis.2d 68, 90–102, 640 N.W.2d 788, 798–805 (Sup.Ct.2002) (Wisc.law); *Milroy v. Hanson,* 875 F.Supp. 646, 648–50 (D.Neb.1995) (Nebraska law); *see also Barr v. Harrah's Entm't, Inc.,* 2008 WL 906351, \*3–7 (D.N.J. March 31, 2008) (interpreting Delaware law but declining to apply *Kirby* to former director's class-action suit).

■ In sum, we conclude that plaintiffs are not entitled, based on Mr. Fitzpatrick's former corporate status, to access documents reflecting privileged communications between AIGGRE or AIG and their counsel.

## II. *The Fiduciary Exception to the Attorney–Client Privilege*

As a back-up theory for invading defendants' attorney-client privilege, plaintiffs in-

---

**6.** Plaintiffs appear to argue also, in a less ambitious vein, that Fitzpatrick should at least be able to access documents that he once authored or received or otherwise viewed while serving as President and Board member. (Letter from Petrella, 4, Aug. 24, 2010; Declaration of Kevin Fitzpatrick executed Aug. 24, 2010 at ¶ 15). Insofar as this apparent argument rests on the assumption that for these documents he was in a different status than with respect to other privileged communications undertaken during his tenure, we see no basis for that unspoken assumption. If he was not a client himself, he has no right to access the documents now, when he is no longer with the company and in an adverse posture to it. *See, e.g., Weintraub,* 471 U.S. at 349 & n. 5, 105 S.Ct. 1986.

The plaintiffs' position might also conceivably rest on another unstated assumption—that because Fitzpatrick actually saw this universe of documents while he was with AIGGRE, the privilege at least vis-a-vis him should be deemed waived or viewed as impractical to enforce. Again we disagree. There was no waiver because his exposure to the documents took place when he was authorized to see them by virtue of his position as a corporate fiduciary. That does not entitle him to access to those documents now. Indeed, once a corporate insider leaves the company, he has no inherent right to take copies of any corporate documents with him, much less privileged documents. *E.g., id.* As for the practicality argument, whether or not Fitzpatrick can recall portions of privileged corporate communications in which he participated or to which he was exposed as part of his duties, he is not by virtue of that fact entitled to access the documents. [We note by analogy that, when a corporate fiduciary leaves the employ of the company, he is ordinarily bound to respect properly asserted corporate privacy interests, for example, by not appropriating trade secrets to which he may have been exposed during his tenure. *See, e.g., Johnson v. Brewer & Pritchard, PC,* 73 S.W.3d 193, 202 (Tex.2002) (describing "certain limitations on the conduct of an employee who plans to compete with his employer," which includes a prohibition against appropriating trade secrets) (quoting *Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 172, 565 N.E.2d 415, 417 (1991)); *Eastern Marble Prods. Corp. v. Roman Marble, Inc.,* 372 Mass. 835, 841–842, 364 N.E.2d 799, 803 (1977) (explaining that "basic principles of equity" and "an implied contract" forbid an employee from using or disclosing confidential information acquired during his employment) (citing cases).]

Similarly, the courts enforce a protective principle for privileged documents that have been inadvertently produced to the other side during litigation. Ordinarily, even if the adversary has reviewed such inadvertently produced documents and thus learned their contents, it will be obliged to return them and make no use of them in the lawsuit (unless the producing party has been so sloppy in its vetting procedure as to be deemed to have waived its privilege). *See* Fed. R.Evid. 502(b) (stating that a disclosure does not operate as a waiver where 1) the disclosure is inadvertent, 2) the holder of privilege took reasonable steps to prevent disclosure and 3) the holder promptly took reasonable steps to rectify the error); Fed.R.Evid. 502 Advisory Committee Notes, Explanatory Note (Rev'd 2007), stating that:

Courts are in conflict over whether an inadvertent disclosure of a communication or information protected as privileged or work product constitutes a waiver. A few courts find that a disclosure must be intentional to be a waiver. Most courts find a waiver only if the disclosing party acted carelessly in disclosing the communication or information and failed to request its return in a timely manner. And a few courts hold that any inadvertent disclosure of a communication or information protected under the attorney-client privilege or as work product constitutes a waiver without regard to the protections taken to avoid such a disclosure … The rule opts for the middle ground.

voke what is sometimes referred to as the fiduciary exception to the privilege. They assert that defendants acted in a fiduciary capacity with respect to Fitzpatrick and his various entities because AIG controlled the real-estate partnerships that were the source of the payments to which the plaintiffs were entitled, and hence, they argue, AIG may not shield its attorney-client communications (or some unspecified subset of them) from plaintiffs as beneficiaries. We disagree.

The fiduciary exception to the privilege appears to derive principally from the law of trusts, although it has been applied, in modified form, in a variety of other contexts. As we observed on another occasion:

> The common law recognizes an obligation on the part of the trustee to provide full and accurate information to the beneficiary on his management of the trust. As part of this obligation, the trustee must make available to the beneficiary, on request, any communications with an attorney that are intended to assist in the administration of the trust. George Gleason Bogert & George Taylor Bogert, *The Law of Trusts & Trustees,* § 961 at 11 (rev.2d ed. 1983) ... As noted by the Delaware Chancery Court, quoting Professor Scott:
>
>> A beneficiary is entitled to inspect opinions of counsel procured by the trustee to guide him in the administration of the trust.
>
> *Riggs Nat'l Bank v. Zimmer,* 355 A.2d at 712 (quoting *Scott on Trusts* § 173 at 1407 (3d ed.1967)).

*Martin v. Valley Nat'l Bank,* 140 F.R.D. 291, 322 (S.D.N.Y.1991) (citations omitted). *See also In re Omnicon Group, Inc. Sec. Litig.,* 235 F.R.D. 400, 410 (S.D.N.Y.2006) (describing the origins of the fiduciary exception as stemming from the principle that "a trustee may not withhold from the beneficiary any communications by the trustee with an attorney that were triggered by the trustee's need for advice on how to carry out his fiduciary responsibilities"). The scope of this principle is limited by its rationale, stated at length in *Riggs:*

> As a representative for the beneficiary of the trust which he is administering, the trustee is not the real client in the sense that *he* is personally being served. And, the beneficiaries are not simply incidental beneficiaries who *chance* to gain from the professional services rendered. The very intention of the communication is to aid the beneficiaries. The trustees here cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege. The policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is here ultimately more important than the protection of the trustees' confidence in the attorney for the trust ... The fiduciary obligations owed by the attorney at the time he prepared the memorandum were to the beneficiaries as well as to the trustees. In effect, the beneficiaries were the client of [the attorney] as much as the trustees were, and perhaps more so.

*Riggs Nat'l Bank v. Zimmer,* 355 A.2d 709, 713–14 (Del.Ch.1976) (emphasis in original). This principle has been applied with some consistency, with the courts (including federal courts) holding "that communications between trustees of a benefits plan and an attorney concerning how to manage the plan are not protected from plan participants." *Martin,* 140 F.R.D. at 323 (citing *inter alia, Hammond v. Trans World Airlines, Inc.,* 1991 WL 93498, *2 (N.D.Ill. May 22, 1991); *Koch v. Exide Corp.,* 1989 WL 49515, *1–2 (E.D.Pa. May 10, 1989); *Washington–Baltimore Newspaper Guild v. Washington Star Co.,* 543 F.Supp. 906, 909 (D.D.C.1982)).

In contexts other than trusts, the exception noted here has been frequently modified to limit ready access by fiduciary-type beneficiaries to the otherwise privileged communications of their fiduciaries. This has taken the form of a "good cause" requirement, a standard derived from the Fifth Circuit's decision in *Garner v. Wolfinbarger,* 430 F.2d 1093, 1103–04 (5th Cir.1970), which involved a shareholder derivative action and rested upon the notion that the defendant officers of the corporation owed a fiduciary obligation to the company. Given that obligation, the Court held that shareholders suing for the corporation could pierce the privilege if they showed good cause, a test that looked to such

considerations "as the number of beneficiaries whose interests were at stake in the lawsuit, the facial adequacy and apparent good faith of the plaintiff's claims, the importance of the information to the inquiring party's case, and whether the allegedly privileged communications concerned the very lawsuit in which discovery was sought." *Martin,* 140 F.R.D. at 323 (citing *Garner,* 430 F.2d at 1103–04). Other courts have applied this "good cause" test to various non-trust fiduciary relationships. *See id.* at 323–24 (citing cases).

 Plaintiffs' case, insofar as it focuses on payments from the various real-estate partnerships, does not involve a trust, even if we assume for present purposes that AIG had certain fiduciary responsibilities toward the plaintiffs regarding payment from the profits interest of those ventures.[7] Hence in any event plaintiffs would have to show good cause for piercing whatever privilege they are challenging, and they fail meaningfully to do so. *See generally In re Braniff,* 153 B.R. at 944 (summarizing key factors in good-cause analysis).[8] More problematic still is that plaintiffs fail to demonstrate that the attorneys whose communications with defendants they seek were retained by AIG to advise the company on the performance of its fiduciary duties. This distinction also derives from the law of trusts, and is significant here. As stated in Bogert & Bogert:

> The beneficiary [of a trust] has a right to obtain and review legal opinions given the trustee to enable the trustee to carry out the trust except for such opinions as the trustee has obtained on his own account to protect himself against charges of misconduct.

*The Law of Trusts & Trustees, supra,* § 961 at 11. This limitation is found as well, in particularly relevant terms, in the Restatement (Second) of Trusts:

§ 173 DUTY TO FURNISH INFORMATION

> The trustee is under a duty to the beneficiary . . . to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust.

Comment:

\* \* \*

> b. What need not be communicated.

> The trustee is privileged to refrain from communicating to the beneficiary information acquired by the trustee at his own expense and for his own protection. Thus he is privileged to refrain from communicating to the beneficiary opinions of counsel obtained by him at his own expense and for his own protection.

Restatement (Second) of Trusts § 173 (1959). *Accord Riggs,* 355 A.2d at 712; *Martin,* 140 F.R.D. at 325.

In short, if the role of A & B and other unspecified attorneys was to advise AIG as to how to protect its own interests when they potentially diverged from those of the beneficiaries of any fiduciary relationship, then communications to that end are not subject to the fiduciary exception. *See, e.g., Donovan v. Fitzsimmons,* 90 F.R.D. 583, 586 (N.D.Ill.1981); *accord Martin,* 140 F.R.D. at 324–25. Plaintiffs make no showing that the corporate attorneys and their privileged com-

---

7. As noted, plaintiff Fitzpatrick also asserts claims for denial of employee benefits, and those claims may implicate some form of trust if he is targeting any employee benefit plans. In asserting his fiduciary-exception argument, however, Fitzpatrick focuses instead on the obligation of AIG to pay him his share of profits from the real estate ventures. (Letter from Petrella, 3–4, Aug. 24, 2010). In any event we address below this alternative issue concerning communications regarding employee benefit plans. *See infra,* at p. 112.

8. Although plaintiffs' claims have survived a motion to dismiss, they completely fail to identify why they need the substance of specific privileged communications, much less the entirety of the documents on the defendants' privilege log. In addition, it is apparent that Mr. Fitzpatrick is suing solely for his own benefit and not for the corporation or a body of fellow shareholders. Finally, as we note in the text, he fails to define a body of communications that are of a nature that fit within the rationale for the fiduciary exception.

munications, which plaintiffs are targeting *en masse,* did not play this protective advisory role for AIG ad AIGGRE, and on the current record we infer that they did.

Accordingly, we conclude that plaintiffs have not justified invoking a fiduciary exception to the attorney-client privilege based on their current showing. Whether they will be able to do so subsequently, perhaps in light of deposition testimony or other evidence-gathering, remains to be seen.

Finally, as we have noted, Mr. Fitzpatrick is asserting several claims regarding employee benefits. The record does not reflect whether these claims target employee benefit plan decisions, which might involve one or more trusts, and he has not focused his fiduciary-exception argument here on those claims. In any event, even if a trust were implicated—which might eliminate the burden of proving good cause, *see, e.g., Martin,* 140 F.R.D. at 326 (explaining why good-cause test was imposed in derivative-suit context) (citing 2 Weinstein's Evidence ¶ 503(b) [05] at 503–56.14)—there is no indication that the identified privileged communications were undertaken for any other purpose than the protection of the clients, that is, AIG and AIGGRE.

### *CONCLUSION*

For the reasons stated, plaintiffs' application to pierce the attorney-client privilege of defendants based either on Mr. Fitzpatrick's former positions with AIGGRE or on the fiduciary exception to the attorney-client privilege is denied.